# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF OMAR MORENO ARROYO, by and through its successor-in-interest Tammy Wilson, et al.,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.:  3:21-cv-01956-RBM-SBC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

**[Doc. 124]**

On June 17, 2024, Defendants filed a Motion to Dismiss Plaintiffs' Third Amended Complaint ("Motion to Dismiss").[1]  (Doc. 124.)  On July 8, 2024, Plaintiffs Estate of Omar Moreno Arroyo ("Estate") and Tammy Wilson ("Wilson") (collectively, "Plaintiffs") filed an Opposition to Defendants' Motion to Dismiss ("Opposition").  (Doc. 125.)  On July 15, 2024, Defendants filed a Memorandum of Points and Authorities in Support of Their Motion to Dismiss Plaintiffs' Third Amended Complaint ("Reply").  (Doc. 127.)

---

[1] The Court notes that Defendants did not move to dismiss Plaintiffs' Fifth Cause of Action.

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons discussed below, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND[2]

### A.    The Parties

#### 1.    Arroyo and Wilson

This case concerns the in-custody death of 33-year-old Omar Moreno Arroyo ("Arroyo"). (Doc. 121 ["TAC"], Introduction at p. 3–5[3], ¶ 31.) Wilson was his wife. (*Id.*, Introduction at p. 3, ¶ 32)

#### 2.    The Arresting and Transporting Officers

Defendant Deputy Jared Anderson ("Anderson") was a deputy with the San Diego County Sheriff's Department who arrested Arroyo. (*Id.*, Introduction at p. 3, ¶ 12.)

Defendant Deputy Craig Rembold ("Rembold") was a deputy with the San Diego County Sheriff's Department who arrested Arroyo. (*Id.* ¶ 14.) Rembold transported and booked Arroyo into the San Diego Central Jail. (*Id.*)

Defendant Sergeant Robert Brunk ("Brunk") was a sergeant with the San Diego County Sheriff's Department who arrested Arroyo. (*Id.* ¶ 13.) He was responsible for supervising Anderson and Rembold. (*Id.*)

#### 3.    The Booking/Screening Officers

Defendant Deputy Kyle McGarvey ("McGarvey") was a deputy with the San Diego County Sheriff's Department and the operator of the body scanner who never identified or inquired with Arroyo about anomalies on his body scan. (*Id.* ¶ 15.)

Defendant Deputy Joshua Westphal ("Westphal") was responsible for training McGarvey on the use of the body scanner. (*Id.* ¶ 22.)

---

[2] The factual summary in this section reflects Plaintiffs' allegations, not conclusions of fact or law by this Court.

[3] The Court cites to the CM/ECF pagination unless otherwise noted.

### 4. The Jail Officers

Defendant Deputy Geo Kakkar ("Kakkar") was a deputy with the San Diego County Sheriff's Department responsible for conducting safety checks and monitoring Arroyo in his holding cell. (*Id.* ¶ 16.) "Kakkar began a safety check at 2141 hours but failed to check on [Arroyo]'s holding cell. This is when [Arroyo] was on the ground suffering a seizure." (*Id.*)

Defendant Deputy Edward Wilt ("Wilt") was a deputy with the San Diego County Sheriff's Department responsible for conducting safety checks and monitoring Arroyo in the holding cell. (*Id.* ¶ 17.) "Wilt performed a safety check at approximately 2234 hours on January 6, 2021. [Arroyo] was lying face down on the cell floor …. Defendant Wilt did nothing." (*Id.*)

Defendant Deputy Tanner Sherman ("Sherman") was a deputy with the San Diego County Sheriff's Department responsible for the overall command of the facility and the movement of inmates and deputies during the time Arroyo suffered a seizure and died. (*Id.* ¶ 18.) "The deputy at this position called 'CCC' or 'Triple C' has control over cameras throughout the facility and elevator traffic." (*Id.*)

Defendant Lieutenant Karl Kamoss ("Kamoss") was a lieutenant with the San Diego County Sheriff's Department responsible for supervising, disciplining, and training Defendants Kakkar and Wilt. (*Id.* ¶ 21.)

Defendant Sergeant Cesar Cardoza ("Cardoza") was a sergeant with the San Diego County Sheriff's Department responsible for supervising, disciplining, and training Kakkar. (*Id.* ¶ 23.) He was responsible for the security checks on the second floor where Arroyo was housed and for staffing the shift with the appropriate number of deputies. (*Id.*)

### B. Wilson Calls 911

On the morning of January 6, 2021, Wilson called 911 to request help for Arroyo, who was under the influence of methamphetamine, behaving in a paranoid and irrational way, and experiencing an acute mental health crisis. (TAC, Introduction at p. 3, ¶¶ 33–35.) Believing there were intruders in the house, Arroyo searched for intruders under the

bed and in the closet. (*Id.*, Introduction at p. 3, ¶ 33.) He also drilled holes in the floor and walls of their home. (*Id.*) Wilson explained to the 911 dispatcher that, while her husband was not violent and had not harmed her, he was paranoid and behaving bizarrely. (*Id.*, Introduction, ¶ 36.) The 911 dispatcher characterized the call as a "5150 – PSYCH" event in reference to California Welfare and Institutions Code § 5150. (*Id.*, Introduction at p. 3, ¶ 37.)

**C.    Arroyo is Arrested, Transported to San Diego Central Jail, and Booked**

At approximately 11:30 AM, Defendants Anderson, Rembold, and Brunk arrived at Arroyo and Wilson's home. (*Id.* ¶ 38.) Dispatch had informed the officers that no crime had been committed, that Arroyo had been drilling holes in the walls of his home believing there was an intruder in the house, and that Wilson had called for mental health help. (*Id.* ¶ 45.) Wilson then told the officers that Arroyo had a heart condition, was under the care of a cardiologist, and was required to take daily medicine for his heart, which she gave to them. (*Id.* ¶ 48.)

The officers placed Arroyo in handcuffs and took him to the porch. (*Id.* ¶ 38.) They looked around the house and saw a glass pipe. (*Id.* ¶ 39.) They also took Arroyo's pulse which was approximately 160 beats per minute. (*Id.* ¶ 40.) Anderson then waited 10 minutes before taking Arroyo's pulse again. (*Id.* ¶ 44.) Even though Arroyo had been sitting down for 10 minutes, his pulse was still 140 beats per minute. (*Id.* ¶¶ 43–44.) Anderson was trained that a normal heart rate is between 50 and 100 beats per minute.[4] (*Id.* ¶ 43.) Anderson also conducted a sobriety test and checked Arroyo's pupils. (*Id.* ¶ 46.) The deputies were aware that the effects of drug use include irrational paranoia, accidental death, and self-harm. (*Id.* ¶ 47.) Nevertheless, Anderson, the arresting officer, changed the call from a "5150," a call for mental health help, to a "11550," the criminal offense of under the influence of a controlled substance. (*Id.*, Introduction at p. 3, ¶¶ 49, 68.)

---

[4] A normal resting heart rate is between 60 and 100 beats per minute. (TAC ¶ 41.) When a heartrate exceeds 120–140 beats per minute, doctor intervention is required. (*Id.* ¶ 42.)

4

Anderson then instructed Rembold to drive Arroyo to the San Diego Central Jail to be booked.  (*Id*.[5])

Arroyo was still intoxicated and agitated when he arrived at the jail.  (*Id.* ¶ 71.) Arroyo was classified as "book and release."  (*Id.* ¶ 52.)  However, both of Arroyo's charges—Possession of Opium Pipe or Controlled Substance Paraphernalia (Health and Safety Code ['HSC'] § 11364) and Under the Influence of a Controlled Substance (HSC § 11550)—were not bookable offenses under the Emergency Booking Acceptance Criteria COVID-19 Precaution.  (*Id.*)  For this reason, Rembold changed the charge to Penal Code § 647(f) ("drunk in public"), which requires the arrestee to be found in a public place.  (*Id.* ¶¶ 56–57, 68.)  In other words, "Rembold made up a charge."  (*Id.* ¶ 68.)

Once Rembold was advised that Arroyo was in his home (i.e., not in public) when he was arrested and could not have violated Penal Code § 647(f), the jail booking staff refused to release Arroyo.  (*Id.* ¶ 69.)  Rembold did not notify the supervisor or the watch commander, who had the authority to release Arroyo, of the error.  (*Id.* ¶ 70.)  Rembold also did not provide Arroyo's medical information to the booking staff, including that Arroyo's heart rate was measured at 160 beats per minute.  (*Id.* ¶¶ 63, 73.)  Rembold denied that Arroyo was suffering from an illness and denied that Arroyo was under the influence of drugs or alcohol.  (*Id.* ¶¶ 65, 72.)  Rembold did not inform the intake officials that Wilson had expressed concern regarding Arroyo's mental health or that Wilson's call for assistance had been categorized a "5150 PSYCH" event, despite Rembold's notation in his report that the call to Arroyo's home was a 5150 call.  (*Id.* ¶ 66.)  Rembold admitted that he felt that Arroyo was unable to care for himself.  (*Id.*)  Rembold also did not communicate to the booking staff any of the information in Anderson's probable cause statement, which explained the reason for the call and stated that Arroyo's heart rate was 140 beats per

---

[5] The Court notes that paragraph 68 of the TAC seems to indicate that HSC § 11550 prohibits public intoxication, which is not accurate.  HSC § 11550 criminalizes being under the influence of a controlled substance.  (TAC, Introduction at p. 3.)

minute.  (*Id.*)  Finally, when asked if there was any indication of a mental health concern, Rembold said "no."  (*Id.* ¶ 67.)

Plaintiffs allege that, "[h]ad [] Anderson and/or Rembold relayed [sic] these significant health concerns, [Arroyo] would have been placed in a Sobering Cell or Medical Observation Bed where he would have received constant monitoring and assessment by medical staff.  Closer observation and monitoring would have prevented [Arroyo] from dying as medical staff monitoring [Arroyo] would have noticed his deteriorating status and provided him with medical care."  (*Id.* ¶ 74.)

## D.    Arroyo Undergoes a Body Scan

Upon arrival at the jail, McGarvey administered an x-ray to check Arroyo for contraband.  (*Id.* ¶ 75.)  The x-ray showed foreign objects in Arroyo's abdomen, which the jail staff informed the Medical Examiner was possibly a bag of an illicit substance.  (*Id.* ¶¶ 75, 78.)  McGarvey neither identified nor inquired about the anomaly.  (*Id.* ¶ 75.)  Video surveillance shows that McGarvey was looking at paperwork while he conducted the body scan.  (*Id.* ¶ 76.)  He then brightened the scan and then walked away from the machine.  (*Id.*)  Even though McGarvey was required to inquire about the anomaly, ask Arroyo to turn over the object, and then re-scan Arroyo's body, no action was taken and there was no formal documentation noting the anomaly until after Arroyo's death.  (*Id.* ¶¶ 77, 79–80.)  According to the County of San Diego Citizens Law Enforcement Review Board ("CLERB"), the scan had enough anomalies to alarm any operator, yet McGarvey "saw the anomaly and ignored it."  (*Id.* ¶¶ 87–88.)  McGarvey and medical staff cleared Arroyo as "fit for booking."  (*Id.* ¶ 103.)  Arroyo was placed under "book and release" status, which meant that he was supposed to be released once he "sobered up."  (*Id.* ¶ 109.)  The jail staff gave Arroyo a COVID-19 mask.  (*Id.* ¶ 115.)

Plaintiffs allege that, "[r]ather than placing him in a sobering cell or medical observation bed, jail authorities placed [Arroyo] in a book and release cell and subsequently failed to monitor his condition."  (*Id.* ¶¶ 110–111.)  Plaintiffs also allege that "[Arroyo] was not placed in a sobering cell, medical observation bed or a psychiatric cell

where he could have been properly checked and monitored, despite the fact he was in a state of acute methamphetamine intoxication and agitation, was unable to care for himself, and was in danger of death due to his heart condition." (*Id.* ¶ 114.)

**E.    Arroyo Dies**

"At approximately 9:36 PM[,] Kakkar started conducting his hourly safety checks of the first floor." (*Id.* ¶ 121.)

At 9:37 PM, in Dressout Holding Cell #1, Arroyo slouched down and put something in his mouth, possibly his mask. (*Id.* ¶¶ 122–24.) "At around this time, Kakkar who had just started [his] safety checks, heard a disturbance inside a cell called Pretrial Services 2 or 'PTS2.' PTS2 is down the hallway from Dressout Cell #1 and close in proximity. When Kakkar opened the door to PTS2, an inmate rushed past Kakkar and picked up a broom in the hallway." (*Id.* ¶ 125.) Kakkar called on the radio for "cover." (*Id.* ¶ 126.)

"At 9:39 PM, multiple deputies [rushed] past Dressout Cell #1. They are believed to be responding to Kakkar's call." (*Id.* ¶ 127.) Kakkar and the other deputies used force on the inmate to take the broom away from him. During this confrontation, the inmate struck Kakkar on the head and broke his hand. (*Id.* ¶ 128.)

At 9:41 PM, Arroyo collapsed forward off the bench onto the floor in front of him and had seizure-like activity until approximately 9:42 PM. (*Id.* ¶132.)

At 9:43:31 PM, while Arroyo was lying face down on the ground, twelve deputies and supervisors walk past Arroyo's cell at a normal pace. (*Id.* ¶ 133–34.) "At this time, [Arroyo was] unconscious in his cell in front of the door to the cell. He [was] visible through the glass windows and also the glass of the door." (*Id.* ¶ 135.)

"[O]ne final body movement was observed at 9:44 PM." (*Id.* ¶ 136.)

"Instead of completing his safety check, Kakkar went to the nurses' station on the second floor after a use of force incident involving another inmate. Kakkar then left the facility to obtain medical attention for an injury to his hand." (*Id.* ¶ 138.) Kakkar did not notify other deputies that he failed to complete his cell check. (*Id.* ¶ 139.) "Had Kakkar completed his cell check properly within the required 60 minutes, which would have been

between 9:36 [PM] and 9:47 [PM], he would have seen [Arroyo] lying on the floor of the Jail cell suffering a seizure." (*Id.* ¶ 137.)

Kakkar was required to check Arroyo's cell between 9:37 PM and 9:47 PM. (*Id.* ¶ 151.) During this ten-minute period, Arroyo fell to the floor and suffered a seizure. (*Id.*) Not a single deputy checked the cell for over two hours. (*Id.* ¶ 152.)

Sergeant Cardoza responded to Kakkar's call for cover and came to the scene. (*Id.* ¶ 129.) Cardoza asked Kakkar what happened, and Kakkar gave everyone a coherent account of what led to the incident. (*Id.* ¶ 140.) Cardoza knew that Kakkar had injured his hand and was leaving the facility to receive medical attention. (*Id.* ¶ 141.) Cardoza did not ask whether the cell check was completed. (*Id.* ¶ 142.) Cardoza walked past Arroyo's cell, where Arroyo was lying face down, and did nothing. (*Id.*)

Defendant Sherman worked in the main central command for the entire facility. (*Id.* ¶ 143.) Sherman was responsible for initiating and logging the safety checks for the second floor. (*Id.*) Sherman knew that Kakkar had initiated a safety check at 9:36 PM. (*Id.*) "Sherman was made aware at approximately 9:39 PM that Kakkar was involved in an incident for which Kakkar left the facility." (*Id.* ¶ 144.) "Sherman knew that Kakkar could not have completed the safety checks of the entire floor in 3 minutes from the 9:36 PM initiation of the rounds until the 9:39 PM when Kakkar engaged in the use of force." (*Id.* ¶ 146.) "Sherman had access to each of the Dressout holding cells by live video feed and could see [Arroyo] lying on the ground not moving. Sherman did nothing to notify other deputies or supervisors that the safety check had been abandoned or that [Arroyo] was lying face down not moving for an hour." (*Id.* ¶ 148.)

Lieutenant Kamoss also responded to the scene. (*Id.* ¶ 131.) He did not inquire "as to whether a cell check had been completed as required by California state law. He did nothing." (*Id.* ¶ 149.)

At approximately 10:34 PM, Defendant Wilt observed Arroyo lying face down, unconscious on the floor of the cell. (*Id.* ¶ 190.) Wilt did not check Arroyo for signs of life or render any medical. (*Id.*) Wilt did nothing. (*Id.*)

At 10:49 PM, Arroyo was discovered unresponsive during the night hard count. (*Id.* ¶ 192.)

**F.    Wilson Arrives at the Jail**

Wilson called the jail at 7:30 PM. (*Id.* ¶ 199.) The jail staff told Wilson that Arroyo was in the process of being released. (*Id.* ¶ 200.) Wilson arrived at the jail at 10:00 PM to collect her husband. (*Id.* ¶ 201.) The jail staff again told Wilson that her husband was in the process of being released. (*Id.* ¶ 202.) Wilson waited in her car and checked on her husband every 45 minutes. (*Id.* ¶¶ 203–4.) The jail staff did not inform Wilson that her husband was dead until 5:00 AM the following morning. (*Id.* ¶ 205.)

## II.    LEGAL STANDARD

**A.    Federal Rule of Civil Procedure 8(a)(2)**

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claims showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The primary purpose of Rule 8(a)(2) is "to give the defendant fair notice of the factual basis of the claim[.]" *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841 (9th Cir. 2007). Therefore, "[a] plaintiff suing multiple defendants 'must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2) ….'" *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1067–68 (E.D. Cal. 2012) (quoting *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)); *see also Holtegaard v. Howroyd-Wright Emp. Agency, Inc.*, Case No. EDCV 20-509 JGB (KKx), 2020 WL 6051328, at *3 (C.D. Cal. Aug. 11, 2020) ("As a general matter, Rule 8(a) requires a plaintiff to differentiate allegations against multiple defendants.") (citation omitted).

**B.    Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to Rule 12(b)(6), an action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability

9

requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

When a Rule 12(b)(6) motion is granted, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## III.    <u>FEDERAL CONSTITUTIONAL CLAIMS</u>

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (citation omitted). "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)). Here, Defendants do not dispute that the individual defendants were acting under the color

of State law in their capacities as law enforcement officers.  Thus, the question is whether Plaintiffs have alleged violations of rights secured by the Constitution or laws of the United States.  The Court addresses each of Plaintiffs' federal constitutional causes of below.

**A.    First Cause of Action—Deliberate Indifference to a Serious Medical Need**

Because the applicable deliberate indifference standard differs depending on the type of officer in question, the Court first addresses the arresting and transporting officers and then addresses the jail officers.

**1.    The Arresting and Transporting Officers**

"'Claims of denial of medical care during and immediately following an arrest are analyzed under the Fourth Amendment and its 'objective reasonableness' standard.'" *Ames v. Cnty. of San Bernardino*, Case No. EDCV 18-1362 JGB (JEMx), 2020 WL 5875012, at *6 (C.D. Cal. July 30, 2020) (quoting *Est. of Adomako v. City of Fremont*, Case No. 17-cv-06386-DMR, 2018 WL 587146, at *5 (N.D. Cal. Jan. 29, 2018) (citing *Borges v. City of Eureka*, Case No. 15-cv-00846-YGR, 2017 WL 363212, at *6 (N.D. Cal. Jan. 25, 2017))).  "While the Ninth Circuit has not specified the exact contours of objectively reasonable post-arrest care to a suspect, they have held that 'an officer fulfills this Fourth Amendment obligation by promptly summoning the necessary medical help or taking the injured detainee to a hospital.'"  *Id.* (quoting *Bordegaray v. Cnty. of Santa Barbara*, Case No. 2:14-cv-08610-CAS-JPR, 2016 WL 7223254, at *8 (C.D. Cal. Dec. 12, 2016)) (brackets omitted); *see also Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.").  "'Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect.'"  *Id.* (quoting *Tatum*, 441 F.3d at 1098) (brackets omitted).  "'Courts in the Ninth Circuit have often held that the reasonableness inquiry under the Fourth Amendment is

1    ordinarily a question of fact for the jury.'" *Id.* (quoting *Henriquez v. City of Bell*, Case No.
2    CV 14-196-GW(SSx), 2015 WL 13357606, at *7 (C.D. Cal. Apr. 16, 2015)).

3         In their Motion to Dismiss, Defendants argue that the Estate's claim for deliberate
4    indifference to a serious medical need fails because Defendants Anderson, Rembold, and
5    Brunk acted reasonably in taking Arroyo to jail where he received a medical examination.
6    (Doc. 124-1 at 15.)  Plaintiffs respond that they have sufficiently alleged Defendants
7    Anderson, Rembold, and Brunk's deliberate indifference to Arroyo's serious medical
8    needs because these defendants knew Arroyo was suffering from significant mental health
9    issues, knew Arroyo's heart rate was dangerously high, and knew Arroyo had a heart
10    condition, but still did not transport Arroyo to the hospital or transmit critical medical
11    information to the jail staff.  (Doc. 125 at 19–20.)

12         Because "[a] plaintiff suing multiple defendants 'must allege the basis of his claim
13    against each defendant to satisfy [Rule] 8(a)(2)[,]'" *Altman*, 850 F. Supp. 2d at 1067–68
14    (quoting *Gauvin*, 682 F. Supp. at 1071), the Court addresses each arresting and transporting
15    officer in turn.

16              **a.    Brunk**

17         The Court finds that Plaintiffs have adequately alleged that Brunk failed to provide
18    Arroyo objectively reasonable post-arrest care.  Plaintiffs allege that Brunk arrived at
19    Arroyo's house at 11:30 AM on January 6, 2021, where he, along with Anderson and
20    Rembold, placed Arroyo in handcuffs, took him to the porch, and denied him medical care
21    despite knowing that Arroyo was suffering from acute methamphetamine intoxication and
22    had an elevated resting heart rate.  (TAC, Introduction at p. 3–4, ¶¶ 13, 38, 326, 329.)
23    Plaintiffs also allege that Brunk assisted Anderson and Rembold in changing Arroyo's
24    charge to "drunk in public," when Arroyo was not in public.  (*Id.* ¶ 374.)  Therefore, at this
25    stage, Plaintiffs have adequately alleged that Brunk failed to provide Arroyo objectively
26    reasonable post-arrest care.  *See Ames*, 2020 WL 5875012, at *6 ("Courts in the Ninth
27    Circuit have often held that the reasonableness inquiry under the Fourth Amendment is
28    ordinarily a **question of fact for the jury**.") (internal quotation omitted) (emphasis added).

### b. Anderson

Next, the Court finds that Plaintiffs have adequately alleged that Anderson failed to provide Arroyo objectively reasonable post-arrest care. Plaintiffs allege that Anderson knew that Arroyo was drilling holes in the walls of his home and believed there was an intruder in his house. (*Id.* ¶ 45.) Plaintiffs also allege that Wilson informed Anderson that Arroyo had a heart condition requiring daily medication. (*Id.* ¶ 48.) Plaintiffs allege that Anderson took Arroyo's pulse twice, first at 160 beats per minute and then at 140 beats per minute, even after Arroyo had been sitting down for 10 minutes. (*Id.* ¶¶ 40–45.) Plaintiffs also allege that Anderson was trained that a normal heart rate is between 50 and 100 beats per minute. (*Id.* ¶ 43.) Plaintiffs conclude that, despite Anderson's awareness that Arroyo was acting paranoid and delusional, had an abnormally high heart rate, and had a heart condition requiring daily medication, Anderson changed the call from a "5150" call for mental health help to a "11550" call for being under the influence of controlled substance and had Rembold transport Arroyo to the San Diego Central Jail. (*Id.*, Introduction at p. 3–4, ¶¶ 49, 68.) Accordingly, at this stage, Plaintiffs have adequately alleged that Anderson failed to provide Arroyo objectively reasonable post-arrest care. *See Ames*, 2020 WL 5875012, at *6.

### c. Rembold

Turning to transporting officer Rembold, the Court finds that Plaintiffs have adequately alleged that Rembold failed to provide Arroyo objectively reasonable post-arrest care. Plaintiffs allege that, upon arriving at the jail, Rembold changed the charge from HSC § 11550 to Penal Code § 647(a)—public intoxication—because HSC § 11550 was not a bookable offense during the COVID-19 pandemic. (*Id.* ¶¶ 52, 56–57, 68.) Once he was advised that Arroyo was in his home when arrested (i.e., not in public), Rembold did not notify a supervisor to get permission for Arroyo's immediate release. (*Id.* ¶¶ 69–70.) Rembold also did not provide Arroyo's medical information to the booking staff, denied that Arroyo was suffering from any illness, denied that Arroyo was under the influence of drugs or alcohol, and denied that there was any indication of a mental health

13

concern.  (*Id.* ¶¶ 63, 65, 67, 72–73.)  Rembold also did not inform the booking staff that Wilson had expressed concern regarding Arroyo's mental health despite his own notation in his report that the call to Arroyo's home was a "5150" call.  (*Id.* ¶ 66.)  Rembold also did not communicate any of this information in Anderson's probable cause statement, which indicated that Arroyo's heart rate was 140 beats per minute.  (*Id.*)  At this stage, Plaintiffs have adequately alleged that Rembold failed to provide Arroyo objectively reasonable post-arrest care.  *See Ames*, 2020 WL 5875012, at *6.

### 2.    The Jail Officers

"Individuals in state custody have a constitutional right to adequate medical treatment."  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).  "For inmates serving custodial sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment."  *Id.* (citing same).  "However, pretrial detainees have not yet been convicted of a crime and therefore are not subject to punishment by the state.  Accordingly, their rights arise under the Fourteenth Amendment's Due Process Clause."  *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–36, 535 n.16 (1979)).  Here, Arroyo's claim for deliberate indifference to a serious medical need arises under the Fourteenth Amendment's Due Process Clause because he was a pretrial, "book and release" detainee.  *See e.g., Est. of Silva by & through Allen v. City of San Diego*, No. 18cv02282 L (MSB), 2022 WL 17740970, at *9 (S.D. Cal. Dec. 16, 2022).

"[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard."  *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (vacating summary judgment and remanding to district court to apply the objective indifference standard to an individual arrested on heroin related charges and transported to the County jail where he died) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)).  "[T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause

14

of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.*; *see also Russell v. Lumitap*, 31 F.4th 729, 739–40 (9th Cir. 2022) (same) (referring to the "prong[s] of the *Gordon* test"). Regarding the second element, "[a] defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell*, 31 F.4th at 739 (citations omitted).  "'With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071).  "The 'mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment.'" *Id.* (quoting same).  "Thus, the plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting same).

In their Motion to Dismiss, Defendants argue that "the TAC offers no facts, only conclusions, about [Arroyo's] medical condition and/or the alleged 'acute distress,' and offers no facts that any of the [jail] defendants were or should have been aware of any such 'distress'." (Doc. 124-1 at 16–17.)  Defendants assert that there are "simply no facts alleged as to [Arroyo's] condition while at the [j]ail" and "Plaintiffs do not allege facts showing that it was obvious to any of the defendants that [Arroyo] needed any medical care." (*Id.* at 17.)

Plaintiffs respond that their allegations against the jail officers are sufficient. (Doc. 125 at 21–22.)  Specifically, Plaintiffs argue that the body scan image had enough anomalies to alarm any operator, but that McGarvey never alerted the nursing or booking

15

staff, which would have resulted in Arroyo being more closely monitored or sent to the hospital. (*Id.* at 21.)  Plaintiffs argue that Kakkar, Sherman, Wilt, Cardoza, and Kamoss were deliberately indifferent to Arroyo's constitutional rights when they failed to conduct or facilitate the required safety checks. (*Id.* at 21–22.)  Plaintiffs also argue that a reasonable jury could conclude that these defendants walked past or viewed Arroyo's cell on the video camera, saw that he was unconscious, but ignored him. (*Id.* at 22.)

Because "[a] plaintiff suing multiple defendants 'must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2)[,]'" *Altman*, 850 F. Supp. 2d at 1067–68 (quoting *Gauvin*, 682 F. Supp. at 1071), the Court addresses each jail officer in turn.

### a.    McGarvey

Plaintiffs allege that McGarvey saw the body scan anomaly, ignored it, failed to flag the scan as a positive scan, failed to notify the watch commander, failed to place Arroyo on contraband watch, and instead cleared Arroyo as "fit for booking" in violation of the jail's policy. (TAC ¶¶ 75–88.)  Plaintiffs also allege that the scan had enough anomalies to alarm any reasonable operator. (*Id.* ¶¶ 87–88.)  Plaintiffs allege that had Arroyo been put on contraband watch, he would have been closely monitored and watched for any adverse reaction from methamphetamine toxicity, including self-harm. (*Id.* ¶ 89.)  Plaintiffs also allege that placement in a medical observation bed or a sobering cell would have resulted in closer monitoring of Arroyo. (*Id.* ¶ 90.)  Essentially, Plaintiffs allege that McGarvey deprived Arroyo of medical monitoring despite knowing that Arroyo possibly had a bag of methamphetamine in his stomach. (*Id.* ¶¶ 109–11.)  However, Plaintiffs do not allege a bag of methamphetamine was found in Arroyo's stomach or even that methamphetamine intoxication caused Arroyo's death.  Absent allegations connecting the anomaly to Arroyo's death, the Court cannot find that Plaintiffs have adequately alleged that "the defendant caused the plaintiff's injuries." *Russell*, 31 F.4th at 739.  Accordingly, Plaintiffs' claim for deliberate indifference against McGarvey must be dismissed.

### b.    Kakkar

Accepting the allegations against Defendant Kakkar as true, the Court finds that Plaintiffs have not adequately alleged each element of the *Gordon* test with respect to Defendant Kakkar.  Plaintiffs allege that Defendant Kakkar began conducting his hourly safety checks on time but was interrupted when an inmate rushed past Kakkar and picked up a broom in the hallway.  (*Id.* ¶¶12, 125.)  During the confrontation with the inmate, Kakkar was struck on the head and broke his hand.  (*Id.* ¶ 128.)  Understandably, Kakkar went to the nurses' station and then left the facility to obtain medical attention.  (*Id.* ¶ 138.)  These allegations do not illustrate conduct "akin to reckless disregard." *Russell*, 31 F.4th at 739.  Rather, it is objectively reasonable that Kakkar would seek medical attention immediately following the incident, and other deputies were made aware that Kakkar was leaving.  (*Id.* ¶¶ 141, 145.)  Further, while Plaintiffs allege that Kakkar did not finish his safety checks and failed to notify the other deputies that he had not finished his safety checks (*id.* ¶¶ 137, 139), Plaintiffs also concede Kakkar had no obligation to self-report that he failed to complete the checks (*id.* ¶ 180).  Accordingly, Plaintiffs' claim for deliberate indifference against Kakkar must be dismissed.

### c.    Cardoza and Kamoss

For Defendants Kamoss and Cardoza, Plaintiffs allege that Defendants Kamoss and Cardoza were responsible for supervising Kakkar and Wilt and ensuring that officers were conducting proper cell checks.  (*Id.* ¶ 403.)  Plaintiffs allege that Cardoza knew that Kakkar had injured his hand and was leaving the facility but did not ask Kakkar whether his cell check was completed.  (*Id.* ¶¶ 141–42.)  Similarly, Plaintiffs allege that Kamoss responded to the scene and did not inquire whether the cell check had been completed.  (*Id.* ¶¶ 131, 149.)  Plaintiffs allege that Defendants Kamoss and Cardoza failed to ensure the cell check was complete even when they "knew that their deputies were consistently failing to conduct proper cell checks, leading to numerous death and serious injuries." (*Id.* ¶ 388.)  Therefore, the Court finds that Plaintiffs have adequately alleged that Cardoza and Kamoss acted with something "akin to reckless disregard" for Arroyo's well-being. *Russell*, 31 F.4th at 739.

### d.    Sherman

Plaintiffs allege that Sherman was responsible for initiating and logging safety checks on the second floor and therefore knew that Kakkar had initiated but not completed his safety check due to the "use of force" incident.  (*Id.* ¶¶ 143–44, 146.)  Plaintiffs also allege that Sherman could see Arroyo lying on the ground on the video feed but did nothing to notify other deputies or supervisors.  (*Id.* ¶ 148.)  Therefore, the Court finds that Plaintiffs have sufficiently alleged that Sherman acted with something "akin to reckless disregard" for his central command role and Arroyo's well-being.  *Russell*, 31 F.4th at 739.

### e.    Wilt

Finally, Plaintiffs allege that Defendant Wilt observed Arroyo lying face down, unconscious on the floor of his cell but did not take action.  (*Id.* ¶ 190.)  The Court finds that, as alleged, this behavior amounts to something "akin to reckless disregard" for Arroyo's well-being.  *Russell*, 31 F.4th at 739.

### 3.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case."  *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  A right is "clearly established" when, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"[C]learly established law should not be defined at a high level of generality."

18

*Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Rather, it "must be 'particularized' to the facts of the case."  *Id.* (internal citation omitted).  The Supreme Court has repeatedly stressed that courts must not define clearly established law "at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *D.C. v. Wesby*, 583 U.S. 48, 63–64 (2018).

There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft*, 563 at 741.  The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust consensus of cases of persuasive authority."  *Wesby*, 583 at 63 (internal quotation marks and citations omitted).  The Supreme Court has also made clear "that officials can be on notice that their conduct violates established law even in novel factual situations."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" even if the specific action in question has not previously been held unlawful.  *See Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (quoting *Hope*, 536 U.S. at 741).

Having already found that Plaintiffs adequately allege constitutional claims for deliberate indifference against officers Brunk, Anderson, Rembold, Cardoza, Kamoss, and Wilt, the question now is "whether the right[s] [at issue were] clearly established in light of the specific context of the case."  *Robinson*, 566 F.3d at 821 (citation omitted); *see also Est. of Levingston v. Cnty. of Kern*, No. 1:16–cv–00188–DAD–JLT, 2018 WL 1335410, at *8 (E.D. Cal. Mar. 15, 2018) ("*Levingston*") ("Having concluded that there is a cognizable constitutional claim for a jury to consider here, the court now turns to the question of whether the constitutional right placed at issue by plaintiffs' claim was clearly established at the time of the defendant's conduct.").

In their Motion to Dismiss, Defendants argue that "it was not clearly established law as to whether an incarcerated person under the influence of meth should be taken to jail or a hospital."  (Doc. 124-1 at 26.)  In support of their position, Defendants rely on *Est. of*

*Levingston*, 2018 WL 1335410, at *8–10, where the district court held that an arresting officer did not violate a "clearly established right" when he brought an arrestee, suspected to have ingested methamphetamine, to be assessed by firemen and a paramedic instead of taking the arrestee to the hospital.  The district court found:

> The crux of this case is both straightforward and undisputed: [The deputy], apparently concerned, though uncertain, that his arrestee had ingested drugs, sought medical attention for the decedent from firemen and then a paramedic. When neither the firemen nor the paramedic recommended further medical intervention, [the deputy] did not seek it. Even construing the evidence in favor of plaintiffs, the circumstances were not such that any reasonable official would have understood they were violating decedent's constitutional rights by failing to transport him immediately to a hospital.

*Id.* at *10 (citations omitted).  Plaintiffs respond that it was "clearly established" that officers could not ignore obvious signs that Arroyo needed medical attention or close monitoring.  (Doc. 125 at 27–28 (citing *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 671–83 (9th Cir. 2021).)  Plaintiffs also argue that Arroyo has a "clearly established right" to monitoring and cell checks that complied with state law.  (*Id.* at 28 (citing *Medina v. Cnty. of Los Angeles*, No. CV 19-3808-GW-EX, 2020 WL 3964793, at *19 (C.D. Cal. Mar. 9, 2020)).)

As a preliminary matter, the Court does not find Defendants' reliance on *Levingston* persuasive.  First, *Levingston* only concerns the conduct of an arresting officer, not the numerous types of officers at issue here.  Second, in *Levingston*, the arresting officer brought the arrestee, suspected to have ingested methamphetamine, to firemen and a paramedic to seek their medical advice.  *Levingston*, 2018 WL 1335410, at *8–10.  The firemen and the paramedic advised the arresting officers that further medical intervention was not necessary, so, relying on their guidance, the arresting officer took the arrestee to jail.  *Id.*  Here, however, the arresting and transporting officers did not demonstrate the same care or diligence.  The arresting and transporting officers did not seek medical advice even though Arroyo was acting strangely, Arroyo's resting heart rate was either 140 or 160 beats per minute, and Arroyo had a heart condition requiring the care of a cardiologist and

prescription medication.  (*See* TAC ¶¶ 33–37, 40, 43–45, 48.)  Instead, the arresting and transporting officers created a false charge, took Arroyo to jail, and then failed to inform the booking/screening officers that Arroyo was intoxicated, behaving strangely, had an elevated resting heart rate, and required heart medication.  (*See id.* ¶¶ 49, 56–57, 63, 65–68, 72–73.)  Therefore, unlike in *Levingston*, the circumstances here were such that "any reasonable official would have understood they were violating decedent's constitutional rights[,]" 2018 WL 1335410, at *10, and Plaintiffs' claims for deliberate indifference against the arresting and transporting officers—Brunk, Anderson, and Rembold—are not barred by the doctrine of qualified immunity.

The Court is also persuaded by Plaintiffs' argument that Arroyo had a "clearly established right" to monitoring and cell checks that complied with state law.  Proper monitoring and cell checks have long been the subject of civil rights litigation in California districts courts.  *See e.g., Rocha v. Kernan*, No. EDCV 17-869-GW(FFMX), 2019 WL 2949031, at *14 (C.D. Cal. Mar. 13, 2019) ("[T]he Court thinks it is beyond debate that: … deliberately ignoring certain policies designed to protect inmates suffering from mental health issues … is unconstitutional.") (citing *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078–79 (9th Cir. 2013) (holding that removing all floor officers from a housing unit of inmates with mental health problems, such that nobody could conduct the required cell checks, can sustain an Eighth Amendment claim)); *Medina*, 2020 WL 3964793, at *16, 19 (rejecting the defendants' argument that the plaintiffs could not "demonstrate that at the time of death, Decedent had a constitutional right to have safety checks of his cell performed on a regular basis").  Thus, Plaintiffs' claims for deliberate indifference against Cardoza, Kamoss, Sherman, and Wilt based on their failure to appropriately monitor and check Arroyo's cell are not barred by the doctrine of qualified immunity.

### 4.    Conclusion

Accepting the factual allegations in the TAC as true and construing these allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs' have adequately

stated claims for deliberate indifference against Defendants Brunk, Anderson, Rembold, Cardoza, Kamoss, Sherman, and Wilt.  *See Manzarek*, 519 F.3d at 1031.  However, the Court finds that Plaintiffs have not adequately stated claims against Defendants McGarvey and Kakkar.  Those claims are **DISMISSED**.

## B.  Third and Fourth Causes of Action—Failure to Train and Failure to Supervise/Discipline

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'"  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)).  "'A plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.  The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right.'"  *Id.* (quoting *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)) (brackets omitted). "The requisite causal connection can be established ... by setting in motion a series of acts by others or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury[.]"  *Id.* at 1207–08 (internal quotations, citations, and brackets omitted).  "'A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'"  *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)).

"Where a plaintiff seeks to hold a supervisor liable in a Section 1983 claim for lack of training, the requisite state of mind is 'deliberate indifference' to the right of citizens whom the untrained officers are likely to encounter."  *Cavanaugh v. Cnty. of San Diego*, No. 3:18-CV-02557-BEN-LL, 2020 WL 6703592, at *26 (S.D. Cal. Nov. 12, 2020) (citing

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *Valentine v. Cnty. of Merced*, No. 1:23-CV-01697-JLT-SAB, 2024 WL 4374303, at *28 (E.D. Cal. Oct. 2, 2024) (same). "Under this standard, a plaintiff must allege facts to show that the County and officers 'disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights.'" *Id.* (quoting *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014)). "To meet this standard, '[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

In their Motion to Dismiss, Defendants argue that Plaintiffs have not alleged facts sufficient to state claims of supervisory liability—Plaintiffs' third and fourth causes of action—against Defendants Gore, Brunk, Kamoss, and Cardoza. (Doc. 124-1 at 19–21.) Specifically, Defendants argue that Plaintiffs have failed to allege the personal knowledge or involvement of Defendants Gore, Brunk, Kamoss, and Cardoza. (*Id.* at 19–20.) Defendants also argue that Plaintiffs' claims against these defendants fail because non-medical supervisors are insulated from liability for decisions related to medical treatment and care. (*Id.* at 20–21.) Plaintiffs respond that Defendant Brunk permitted Defendants Anderson and Rembold to violate the booking policy and deny a man with a dangerously high pulse medical attention and that Defendants Gore, Kamoss, and Cardoza were aware of a lengthy history of constitutional violations by their deputies but failed to properly supervise and train them. (Doc. 125 at 24.)

Because "[a] plaintiff suing multiple defendants 'must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2)[,]'" *Altman*, 850 F. Supp. 2d at 1067–68 (quoting *Gauvin*, 682 F. Supp. at 1071), the Court addresses each supervising officer in turn.

### 1.    Brunk

Here, Plaintiffs allege that Brunk failed to properly train Anderson and Rembold on dealing with a person in medical or psychiatric distress. (TAC ¶¶ 369, 376.) For example,

23

at the time of Arroyo's arrest, neither Anderson nor Rembold were aware of the COVID-19 policy prohibiting deputies from arresting individuals for being under the influence of drugs without first obtaining watch commander approval.  (*Id.* ¶ 370–71.)  Plaintiffs also allege that Brunk was at the scene and assisted Anderson and Rembold in changing the call for medical help to a false charge for being drunk in public.  (*Id.* ¶¶ 374, 402.)  Plaintiffs also allege that Brunk failed to properly supervise his subordinates with regards to communicating critical medical information and providing adequate care.  (*Id.* ¶ 406.)

The Court finds that Plaintiffs have alleged Brunk's "personal involvement in the constitutional deprivation" as well as "a sufficient causal connection between the supervisor's wrongful conduct [i.e., Brunk's inadequate training and supervision] and the constitutional violation."  *Starr*, 652 F.3d at 1207.  Therefore, Plaintiffs' allegations against Brunk are sufficient to withstand Defendants' Motion to Dismiss Plaintiffs' third and fourth causes of action.

### 2.  Gore

Plaintiffs allege that Gore was the Sheriff of the County of San Diego, the highest position within the San Diego County Sheriff's Department, and responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff, and contractors.  (*Id.* ¶ 10.)  Plaintiffs allege that Gore was aware that jail staff were admitting intoxicated arrestees instead of directing them to the hospital for medical care, admitting such individuals without thorough medical and psychiatric evaluations, and failing to closely monitor individuals once admitted.  (*Id.* ¶¶ 210, 212, 247.)  Plaintiffs support these allegations by identifying eight inmate deaths that occurred before Arroyo's death.  (*Id.* ¶ 212.)  Plaintiffs then allege that, despite these deaths, Gore failed to train jail staff to properly book and monitor intoxicated arrestees.  (*Id.* ¶¶ 213, 217.)  Plaintiffs also cite a 2019 San Diego Union Tribune article, which states that at least 140 people have died in San Diego County jails since Gore became Sheriff.  (*Id.* ¶ 251.)  Plaintiffs also allege that National Commission on Correctional Health Care ("NCCHC") consultants found that jail

staff were not formerly trained to recognize inmate drug and alcohol issues. (*Id.* ¶ 266.) Plaintiffs conclude that "[a]lthough … Gore [was] aware of Constitutional deficiencies in the delivery of seriously needed medical and psychiatric care due to the NCCHC audit, and the high number of deaths and injuries suffered by inmates, [he] took no steps to provide additional training and supervision to their subordinates. The failure to provide additional training and supervision to their subordinates was a moving force causing the ultimate injury to decedent [Arroyo]." (*Id.* ¶ 272.)

The Court finds that Plaintiffs' allegations are sufficient to state a claim for supervisory liability against Sheriff Gore. *See e.g., Est. of Serna by & through Gilliland v. Cnty. of San Diego*, No. 20-cv-2096-LAB-DDL, 2023 WL 2025057, at *7 (S.D. Cal. Feb. 15, 2023) (finding the plaintiffs' SAC adequately pled claims for supervisory liability against Sheriff Gore in a similar in-custody death case); *Est. of Rupard by & through Rupard v. Cnty. of San Diego*, No. 23-CV-1357-CAB-BLM, 2024 WL 3894049, at *8 (S.D. Cal. Aug. 21, 2024) (same); *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 20-cv-457-BAS-DEB, 2020 WL 3893046, at *4 (S.D. Cal. July 10, 2020) (same).

### 3. Kamoss

Here, Plaintiffs allege that Kamoss was a lieutenant responsible for supervising, disciplining, and training Kakkar and Wilt. (*Id.* ¶¶ 21, 382.) Plaintiffs allege that Kamoss responded to the use of force incident and knew Kakkar was leaving the jail but took no action to ensure that Kakkar's cell checks were completed. (*Id.* ¶¶ 149, 156, 403.) Plaintiffs allege that Kamoss knew that deputies did not conduct proper safety checks. (*Id.* ¶ 404.) Specifically, Plaintiffs allege that supervisors and deputies referred to the safety checks as "fly bys," "power walks," or "dead walks" because they had found so many people dead. (*Id.*) Plaintiffs allege that Kamoss violated California Code of Regulations Title 15 and California state law when he failed to ensure that his subordinates conducted safety checks. (*Id.* ¶ 354.) Plaintiffs also allege that Kamoss was aware of short staffing

and that various deputies were absent during the shift that Arroyo died when he approved the schedule and when he permitted Kakkar to leave the jail.  (*Id.* ¶ 311.)

Plaintiffs also allege that "Kamoss failed to properly train deputies and medical staff … with respect to the treatment of patients in acute methamphetamine intoxication" and that "[he] did so knowing that the vast majority of the people coming into the [j]ails had abused drugs and that multiple inmates had died in the jails from overdose and complications of drug abuse."  (*Id.* ¶ 377.)  Plaintiffs also allege that "Kamoss knew that the deputies were not releasing arrestees who were brought into jail on non-bookable offenses" and that "he failed to train them on releasing them when there was no basis to continue holding them."  (*Id.* ¶ 386.)  Finally, Plaintiffs allege that Kamoss did nothing to train deputies like Wilt, who saw an unconscious inmate and did nothing.  (*Id.* ¶ 405.)

Accepting these factual allegations in the TAC as true and construing them in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have identified numerous training and supervision failures or deficiencies on the part of Defendant Kamoss and, therefore, have stated a claim for supervisory liability against him.  *See Manzarek*, 519 F.3d at 1031.

### 4.    Cardoza

Plaintiffs allege that sergeant Cardoza was responsible for supervising, disciplining, and training Kakkar; responsible for the safety checks on the second floor where Arroyo was housed; responsible for staffing the shift with the appropriate number of deputies; and responsible for assigning deputies to their roles and filling vacancies for staff that were absent.  (*Id.* ¶¶ 23, 310, 403.)  Plaintiffs allege that Cardoza failed to fill the vacant positions on the day of Arroyo's death.  (*Id.* ¶ 310.)  Plaintiffs also allege that Cardoza knew that Kakkar had injured his hand during the incident and was leaving the facility to receive medical attention but did nothing to inquire and ensure that Kakkar's cell checks were conducted.  (*Id.* ¶¶ 141–42, 156, 403.)  Plaintiffs also allege that Cardoza knew that deputies often lied about conducting safety checks.  (*Id.* ¶ 165.)  Cardoza also did not document the failed safety check until two days after Arroyo's death.  (*Id.* ¶¶ 155, 159.)

26

Plaintiffs also allege that Cardoza "failed to properly train deputies and medical staff … with respect to the treatment of patients in acute methamphetamine intoxication" and "did so knowing that the vast majority of the people coming into the [j]ails had abused drugs and that multiple inmates had died in the jails from overdose and complications of drug abuse." (*Id.* ¶ 377.)  Plaintiffs conclude that "Cardoza knew that [his] deputies were consistently failing to conduct proper cell checks" and "knew that housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs" leading to deaths.  (*Id.* ¶ 388.)  Despite this knowledge, Cardoza failed to train his staff.  (*Id.*)

Accepting these factual allegations in the TAC as true and construing them in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have identified numerous training and supervision failures or deficiencies on the part of Defendant Cardoza and, therefore, have stated a claim for supervisory liability against him.  *See Manzarek*, 519 F.3d at 1031.

### 5.    Westphal

Plaintiffs allege that Defendant Westphal was the Operations Deputy in charge of training at the San Diego Central Jail and was responsible for training McGarvey on the use of the body scanner.  (*Id.* ¶¶ 22, 96, 387.)  Plaintiffs allege that "Westphal failed to properly train the deputies on the use of the body scanner …." (*Id.* ¶ 101.)  Specifically, Plaintiffs allege that "Westphal trained McGarvey who learned not to look at any area above the pelvis." (*Id.* ¶ 387.)  Plaintiffs also allege that "Westphal failed to properly supervise deputies who were charged with reading results of an X-ray machine, which they were not qualified to perform." (*Id.* ¶ 407.)

As stated above, because Plaintiffs do not allege that Westphal had any personal involvement with Arroyo or jail operations on the day of Arroyo's death, Plaintiffs must allege "a sufficient causal connection between [Westphal's] wrongful conduct and the constitutional violation.'" *Starr*, 652 F.3d at 1207.  Here, while Plaintiffs allege that Westphal's body scanner training was inadequate, Plaintiffs do not allege a causal

connection between Westphal's inadequate training, the body scan anomaly, and Arroyo's death.  For example, Plaintiffs do not allege that contraband methamphetamine was found in Arroyo's stomach and that this methamphetamine caused his death.  Instead, Plaintiffs' theory of causation appears to be that, had McGarvey been properly trained, he would have flagged the anomaly, done further analysis of the anomaly, re-scanned Arroyo, flagged the anomaly again, and then placed Arroyo on contraband watch, where Arroyo would have been closely monitored and therefore not have died.  The Court finds this theory of causation too attenuated and speculative to demonstrate "a sufficient causal connection between [Westphal's] wrongful conduct and the constitutional violation.'" *Starr*, 652 F.3d at 1207.  Plaintiffs' claims against Westphal for supervisory liability—Plaintiffs' third and fourth causes of action—must be dismissed.

### 6.    Qualified Immunity

As explained in more detail above (*see* Section III.A.3), "the doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate **clearly established** statutory or constitutional rights of which a reasonable person would have known."  *Pearson*, 555 U.S. at 231 (quotation omitted) (emphasis added).  Having already found that Plaintiffs adequately allege supervisory claims against Gore, Brunk, Cardoza, and Kamoss, the question now is "whether the right[s] [at issue were] clearly established in light of the specific context of the case[.]".  *Robinson*, 566 F.3d at 821 (citation omitted); *see also Levingston*, 2018 WL 1335410, at *8.  The Court finds that they were.

Here, Plaintiffs' claims against Gore, Cardoza, and Kamoss center on their failure to ensure that their deputies properly monitored and cared for inmates.  As stated above, the Court finds that Arroyo had a "clearly established right" to monitoring and cell checks that comply with state law.  (*See* Section III.A.3.)  Therefore, Gore, Cardoza, and Kamoss are not entitled to qualified immunity on Plaintiffs' supervisory liability claims.

Further, the Court finds that "any reasonable official" in Brunk's position "would have understood they were violating decedent's constitutional rights" when, rather than

training his subordinates on the proper protocol, he assisted them in arresting Arroyo on false charges without seeking medical care or advice. *Levingston*, 2018 WL 1335410, at *10. Thus, Brunk is not entitled to qualified immunity on Plaintiffs' supervisory liability claims.

### 7. Conclusion

Accepting the factual allegations in the TAC as true and construing these allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs' have adequately stated supervisory liability claims against Defendants Brunk, Gore, Kamoss, and Cardoza. *See Manzarek*, 519 F.3d at 1031. However, the Court finds that Plaintiffs have not adequately stated a supervisory liability claim against Defendant Westphal. Any such claim is **<u>DISMISSED</u>**.

## C. Second Cause of Action—Deprivation of the Right of Familial Association

In their Motion to Dismiss, Defendants argue that Wilson's Fourteenth Amendment claim for loss of familial association fails because spouses do not have standing for such claims and the governmental actors' conduct does not "shock the conscious." (Doc. 124-1 at 18.) Wilson responds that she has alleged claims under both the First and Fourteenth Amendments, and Defendants have waived any challenge to Wilson's claim under the First Amendment by not raising any challenge in their Motion to Dismiss. (Doc. 125 at 22–23.) The Court addresses each Amendment in turn.

### 1. Fourteenth Amendment

"This case involves a familial-association claim asserted by a spouse, rather than a parent or child." *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022). "[The Ninth Circuit has] not previously held whether a [Fourteenth Amendment] substantive due process right exists in that context, and other courts of appeals have reached conflicting conclusions." *Id.* (comparing *Griffin v. Strong*, 983 F.2d 1544, 1546–48 (10th Cir. 1993) with *Harbury v. Deutch*, 233 F.3d 596, 607 (D.C. Cir. 2000)); *see also Lee v. Cnty. of Los Angeles*, Case No. CV 16-2039 DSF (JPRx), 2018 WL 6016992, at *3 (C.D. Cal. Mar. 6, 2018) ("[T]his Circuit has not directly addressed whether there is a substantive due process right to the

29

familial association with one's spouse."). Further, "[District] Courts [in California] disagree over whether the Fourteenth Amendment's protections extend to spousal relationships." *Est. of Serna by & through Gilliland*, 2023 WL 2025057, at *5 (comparing *Lee v. Cnty. of Los Angeles*, No. CV 16-2039 DSF (JPRx), 2018 WL 6016992, at *3 (C.D. Cal. Mar. 6, 2018) with *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1273–74 (E.D. Cal. 2012)).

Because the Ninth Circuit has refrained from creating a substantive due process right to familial association with one's spouse, the Court will not do so here. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."). Further, as explained in more detail below (*see* Section III.C.3), even if the Court were to create such a right, it would not be "clearly established," and Defendants would be entitled to qualified immunity on this claim. *See Hampton v. California*, No. 22-15481, 2023 WL 6443897, at *1 (9th Cir. Oct. 3, 2023) ("This case involves a familial-association claim asserted by a spouse, rather than a parent or child. 'We have not previously held whether a substantive due process right exists in that context, and other courts of appeals have reached conflicting conclusions.' Plaintiff's due process right to familial association with her husband is therefore not 'clearly established,' and Defendants are entitled to qualified immunity on the familial-association claim.") (citing *Peck*, 51 F.4th at 887, 893). Accordingly, Wilson's Fourteenth Amendment claims for the deprivation of her right to associate with her husband are **DISMISSED**.

### 2. First Amendment

"The First Amendment [] protects 'family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Keates v. Koile*, 883 F.3d 1228, 1236 (9th

Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)); *see also Garcia v. Cnty. of Napa*, No. 21-cv-03519-HSG, 2022 WL 110650, at *2 (N.D. Cal. Jan. 12, 2022) ("Plaintiffs' first cause of action alleges that Defendants deprived Plaintiffs of their constitutional rights to 'companionship, society, and support' with [the decedent] through the use of deadly force against him.  Such claims may be brought under either the First Amendment or the Due Process Clause of the Fourteenth Amendment.").  "This right was first identified in *Roberts v. United States Jaycees*, which indicated that protecting intimate relations 'from unwarranted state interference' was necessary to safeguard 'the ability independently to define one's identity that is central to any concept of liberty.'"  *Id.* (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984)).  "Accordingly, [the Ninth Circuit] has held that claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss."  *Id.* (citing *Lee*, 250 F.3d at 685).

Additionally, Ninth Circuit and California district courts have held that the First Amendment right to association extends to fiancés or longtime partners.  *See e.g., Wittman v. Saenz*, 108 F. App'x 548, 550 (9th Cir. 2004) ("[T]he First Amendment right of association extends to individuals involved in an intimate relationship, such as fiancés."); *Graham v. Cnty. of Los Angeles*, No. CV 10-05059 DDP (Ex), 2011 WL 3754749, at *2 (C.D. Cal. Aug. 25, 2011) (finding that a decedent's connection with his fiancé was sufficiently personal and intimate to merit protection under the First Amendment); *Garcia*, 2022 WL 110650, at *2–3 (denying motion to dismiss claim for loss of familial association by "longtime partner and de facto wife" of the decedent); *Broemer v. Tenet*, No. CV 01-04340 MMM (RZx), 2003 WL 27382056, at *5 (C.D. Cal. Sept. 30, 2003) ("In the instant case, the complaint alleges that plaintiff was engaged to his fiancé. … [T]he court concludes that pleading the existence of such a relationship sufficiently alleges the first element of a claim for violation of the First Amendment right of intimate association."); *Fredenburg v. Cnty. of Santa Clara*, No. C 07-04412 JW, 2010 WL 11639785, at *4 (N.D. Cal. Sept. 24, 2010) ("[T]he Court finds that a genuine issue of material fact remains as to

whether [the defendant] violated [the husband and wife's] First Amendment right to association with each other by threatening to not recommend placement of the Children with [the wife] unless she divorce [the husband].").

Here, Wilson alleges that she was Arroyo's wife and that the couple shared a home. (TAC ¶¶ 4, 32.) Wilson then alleges that the "acts and/or omissions of Defendants Anderson, Rembold, Brunk, McGarvey, Kakkar, Cardoza, Sherman, Wilt, [and] Kamoss … in ignoring [Arroyo's] obvious symptoms of serious medical and psychological conditions; being deliberately indifferent to [Arroyo's] serious medical needs, health, and safety; and violating Title 15's requirements on cell checks caused the untimely and wrongful death of [Arroyo] and deprived [Wilson] in her liberty interests in the family relationship in violation of her substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution." (*Id.* ¶ 363.) Put simply, Wilson alleges that Defendants violated her right to familial association with her husband when their deliberate indifference to Arroyo's medical needs and their failure to monitor Arroyo's cell resulted in his death. Thus, Wilson's claim for deprivation of the right of association under the First Amendment is dependent upon Plaintiffs' other constitutional claims.

Because Plaintiffs fail to state other constitutional claims against Defendants Kakkar and McGarvey (*see* Sections III.A–B), Plaintiffs also fail to state claims against Kakkar and McGarvey for deprivation of the right of association under the First Amendment, and any such claim must be **DISMISSED**. However, Plaintiffs' claims against Defendants Brunk, Anderson, Rembold, Cardoza, Sherman, Kamoss, and Wilt for deprivation of the right of association under the First Amendment may proceed because, accepting the factual allegations in the TAC as true and construing those claims in the light most favorable to Plaintiffs, Plaintiffs have adequately stated constitutional claims against those Defendants. (*See* Sections III.A–B.) *See Manzarek*, 519 F.3d at 1031.

### 3. Qualified Immunity

As explained in more detail above (*see* Section III.A.3), "the doctrine of qualified

immunity protects government officials from liability for civil damages insofar as their conduct does not violate **clearly established** statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (quotation omitted). Having already found that Plaintiffs adequately allege claims for deprivation of the right of association against Brunk, Anderson, Rembold, Cardoza, Sherman, Kamoss, and Wilt, the question now is "whether the right[s] [at issue were] clearly established in light of the specific context of the case." *Robinson*, 566 F.3d at 821 (citation omitted); *see also Levingston*, 2018 WL 1335410, at *8.

Here, as discussed above (*see* Section III.C.1), the Ninth Circuit has not decided whether there is a Fourteenth Amendment right to familial association with one's spouse, and California district courts disagree over whether the Fourteenth Amendment's protections extend to spousal relationships. Therefore, because such a right is not "clearly established," Defendants are entitled to qualified immunity on any such claim, and any such claim must be **<u>DISMISSED</u>**. *See Hampton*, 2023 WL 6443897, at *1.

However, Ninth Circuit and California district courts have recognized a clearly established First Amendment right to association that extends to fiancés or longtime partners. The Court finds that this clearly established right also extends to married couples. Therefore, Defendants are not entitled to qualified immunity on any such claim. *See Wittman*, 108 F. App'x at 550; *Graham*, 2011 WL 3754749, at *2; *Fredenburg*, 2010 WL 11639785, at *4.

## IV.   CALIFORNIA STATE LAW CLAIMS

### A.   Sixth and Eighth Causes of Action—Negligence and Wrongful Death

The Court first addresses the sufficiency of Plaintiffs' negligence and wrongful death claims and then addresses state law immunity.

#### 1.   Sufficiency

"Section 1714 of the California Civil Code is the 'general tort provision[]' in California setting forth that each person has 'a legal duty to act reasonably and with due care under the circumstances with respect to their own actions'—i.e., to not act negligently.

33

Section 820 of the California Government Code [then] clarifies that this general duty of care extends to public employees 'to the same extent as a private person.' And, under California Government Code section 815.2, 'a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would ... have given rise to a cause of action against that employee or his personal representative.'" *Bousman v. Cnty. of San Diego*, No. 3:23-cv-1648-W-JLB, 2024 WL 1496220, at *10 (S.D. Cal. Apr. 5, 2024) (citations omitted).

"California Code of Civil Procedure § 377.60 [also] establishes a statutory cause of action in favor of specified heirs of an individual who dies as a result of the 'wrongful act or neglect' of another. Under the statute, the specified heirs are entitled to damages on their own behalf for the loss they have sustained by reason of the victim's death." *Est. of Silva v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL 6946011, at *20 (S.D. Cal. Nov. 25, 2020) (citing *Jacoves v. United Merchandising Corp.*, 9 Cal. App. 4th 88, 105 (1992)). "'The elements of the cause of action for wrongful death are **the tort (negligence or other wrongful act)**, the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs.'" *Id.* (quoting *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006)) (emphasis added). Thus, Wilson's wrongful death claim is contingent upon the Estate's claim for negligence. *See Bousman*, 2024 WL 1496220, at *10 (addressing claims for wrongful death, negligence, and violations of California Government Code § 845.6 together).

"To state a claim [for negligence] under California law, a plaintiff must allege (1) a legal duty to use due care; (2) a breach of such legal duty; and (3) the breach as the proximate or legal cause of the resulting harm." *Id.* at *21 (citing *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009)). "The same allegations supporting liability under a deliberate indifference standard are necessarily sufficient to support liability under a negligence standard." *Est. of Schuck by & through Schuck v. Cnty. of San Diego*, No. 23-CV-785-DMS-AHG, 2024 WL 500711, at *14 (S.D. Cal. Feb. 8, 2024) ("*Schuck*") (citing *Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017)). Plaintiffs

can also "sufficiently allege a negligence claim based on a negligent training and supervision theory." *Id.* at \*15; *see e.g., Est. of Escobar v. United States*, No. 20-CV-2454-L-KSC, 2022 WL 3209380, at \*3–4 (S.D. Cal. Aug. 8, 2022) (denying the defendant's motion to dismiss the plaintiff's negligent supervision claims but granting defendant's motion to dismiss as to the plaintiff's negligent training claims because plaintiffs failed to allege how the negligent training caused the decedent's death). Because Plaintiffs have adequately alleged federal constitutional claims against Brunk, Anderson, Rembold, Cardoza, Kamoss, Sherman, Wilt, and Gore, Plaintiffs have also adequately stated claims against those defendants for negligence. *See Schuck*, 2024 WL 500711, at \*14.

## 2. State Law Immunity—California Government Code § 845.6

Defendants argue that they are immune from Plaintiffs' negligence claims pursuant to California Government Code sections 844.6 and 845.6. (Doc. 124-1 at 21–24.)

"California Civil Code section 1714's general duty of care and California Government Code section 815.2's subsequent vicarious liability provisions are partially modified by section[s] 844.6 and [845.6] of the California Government Code[.]" *Bousman*, 2024 WL 1496220, at \*10. California Government Code § 844.6 states, "a public entity is not liable for: (1) An injury proximately caused by any prisoner; (2) An injury to any prisoner." California Government Code § 845.6 then states, "[n]either a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, … a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." In other words, "[a]lthough Cal. Gov. Code § 844.6 grants immunity to public entities for any injury to a prisoner, it is subject to multiple exceptions. One exception—Cal. Gov. Code § 845.6—provides liability for public entities and employees only if 'the employee knows or has reason to know that the prisoner is in need of immediate medical care and [] fails to take reasonable action to summon such medical care.' Liability under section 845.6 is

35

'limited to serious and obvious medical conditions requiring immediate care.' Liability depends on an outright 'failure to summon medical care,' not on 'negligence in providing care.'" *Est. of Spratt v. Cnty. of Riverside*, Case No. EDCV 23-2096 JGB (KKx), 2024 WL 1601864, at *5 (C.D. Cal. Feb. 29, 2024) (citations omitted) (finding the entity defendants did not adequately summon medical care for the decedent).

"Taken together, this California statutory scheme stands for the proposition that: (1) public entities cannot be held liable for wrongfully or negligently injuring prisoners but public employees can be; unless (2) the prisoner's injury resulted from a failure to furnish medical care (in which case, neither the public employee or public entity are liable); except (3) when the public employee knew or had reason to know that the injured prisoner was in need of immediate medical care and failed to take reasonable action to summon such medical care (in which case, both the public employee and the public entity are liable)." *Bousman*, 2024 WL 1496220, at *11 (footnote citations omitted).

Here, Plaintiffs' theory of the case is not based solely on the failure to furnish medical care. Rather, Plaintiffs' theory of the case is focused on Defendants' failure to properly arrest, book, screen, and monitor Arroyo. Specifically, Plaintiffs allege that the arresting and transporting officers failed to communicate critical information to the booking officers, that the jail officers failed to conduct adequate cell checks, and that the supervising officers failed to adequately train, supervise, and discipline their subordinates. Applying Plaintiffs' allegations to California's statutory scheme, the Court finds that the individual defendants may be held liable for their negligence in arresting, booking, screening, and monitoring Arroyo. Further, the Court finds that, while the County of San Diego cannot be held liable for the failure of the officers to arrest, book, screen, and monitor Arroyo properly, the County of San Diego may be held liable for any officer's failure to summon medical care when he or she observed Arroyo lying face down, unconscious on the floor of his cell but did nothing. (*See* TAC ¶ 190.) Accordingly, Plaintiffs' claims for negligence and wrongful death cannot be dismissed at this time.

## B.    Seventh Cause of Action—Bane Act

The Tom Bane Civil Rights Act ("Bane Act"), California Civil Code § 52.1, provides:

> (b) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. …

> (c) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b), may institute and prosecute in their own name and on their own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured ….

Cal. Civ. Code § 52.1(a)–(c). "Section 52.1 does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations." *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds in Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997); *see also Sholtis v. City of Fresno*, No. CV F 09-0383 LJO GSA, 2009 WL 4030674, at *12 (E.D. Cal. Nov. 18, 2009) (same).

"A plaintiff bringing a Bane Act claim must prove 'two distinct elements': '(1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion.'" *Cisneros v. Vangilder*, No. 16-CV-00735-HSG, 2019 WL 285800, at *6 (N.D. Cal. Jan. 22, 2019) (quoting *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015)). "The Ninth Circuit has held 'the Bane Act does not require the 'threat,

37

intimidation[,] or coercion' element of the claim to be transactionally independent from the constitutional violation alleged' so long as the claimant shows the defendant had a 'specific intent' to commit the constitutional violation." *Schuck*, 2024 WL 3489202, at *5 (quoting *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)). "The specific intent requirement 'is satisfied where the defendant ... acted with '[r]eckless disregard of the right at issue.''" *Id.* (quoting *Est. of Serna v. Cnty. of San Di*ego, No. 20-cv-2096-LAB, 2022 WL 827123, at *8 (S.D. Cal. Mar. 18, 2022)).

"[M]ultiple district courts have adopted the position that 'a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs ... adequately states a claim for relief under the Bane Act.'" *Galley v. Cnty. of Sacramento*, No. 2:23-CV-00325 WBS AC, 2023 WL 4534205, at *5–6 (E.D. Cal. July 13, 2023) (quoting *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013)); *see also Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) (finding "that threats, coercion and intimidation are inherent in deliberate indifference claims" and that "Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials knowingly deprived them of a constitutional right or protection through acts that are inherently coercive and threatening, such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations.") (quotation omitted); *Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("[N]othing in the text of the Bane Act requires that the coercion element be separate from the underlying constitutional or statutory violation. … [A] prison official's deliberate indifference to serious medical needs is a coercive act that rises above mere negligence …."); *Cravotta v. Cnty. of Sacramento*, No. 2:22-CV-00167-DJC-AC, 2024 WL 645705, at *15 (E.D. Cal. Feb. 15, 2024) ("[A]n adequately pled claim for deliberate indifference satisfies the specific intent requirement under the Bane Act."); *but see Razon v. Cnty. of Santa Clara*, No. 17-CV-00869-LHK, 2018 WL 405010, at *6 (N.D. Cal. Jan. 12, 2018) ("[T]he Bane Act 'requires threats, coercion, or intimidation in addition to a constitutional

38

violation, and the plaintiff cannot graft one act onto two distinct burdens.'") (citation omitted).  Because the Court finds Plaintiffs have adequately alleged claims for deliberate indifference against Brunk, Anderson, Rembold, Cardoza, Kamoss, Sherman, and Wilt, the Court also finds Plaintiffs have adequately alleged Bane Act claims against those same defendants.

In contrast, California district courts "are [more] divided as to whether a supervisor may be held liable under the Bane Act." *Est. of Derek Valentine v. Cnty. of Merced*, No. 1:23-CV-01697-JLT-SAB, 2024 WL 4374303, at *43 (E.D. Cal. Oct. 2, 2024) (citations omitted); *see e.g., Peltz v. City of Los Angeles*, Case No. CV 22-3106-MWF (AGRx), 2022 WL 18278417, at *5 (C.D. Cal. Dec. 5, 2022) ("[I]n the absence of either California state decisions, binding authority approving of the imposition of supervisorial liability under the Bane Act, or another state law basis providing a foundation for so doing, the Court declines to read supervisory liability into the Bane Act."); *Est. of Hennefer v. Yuba Cnty.*, No. 2:22-cv-00389-TLN-KJN, 2023 WL 4108077, at *7 (E.D. Cal. June 21, 2023) ("[F]ederal district courts have declined to apply supervisor liability to Bane Act claims."); *James v. City of Los Angeles*, Case No.: 2:21-cv-04525-CBM-ASx, 2023 WL 9234935, at *11 (C.D. Cal. Dec. 5, 2023) ("[C]ourts in this district have declined to read supervisory liability into the Bane Act."); *San Diego Branch of NAACP v. Cnty. of San Diego*, No. 16-cv-2575-JLS (BGS), 2018 WL 1382807, at *7 (S.D. Cal. Mar. 19, 2018) ("Various courts have held that supervisor liability does not apply to Bane Act claims.") (collecting cases); *but see Est. of Luna v. Orange Cnty. Sheriff's Dep't*, No. 8:23-CV-02180-DOC-KESX, 2024 WL 3218649, at *5 (C.D. Cal. June 20, 2024) ("Courts have held that Bane Act claims against sheriffs can be based on supervisory conduct.") (citation omitted); *Cravotta v. Cnty. of Sacramento*, No. 2:22-CV-00167-DJC-AC, 2024 WL 645705, at *15 (E.D. Cal. Feb. 15, 2024) ("Courts have also held that Bane Act claims against sheriffs can be based on supervisory conduct.") (citations omitted).  Because Defendants did not address whether

39

supervisory liability can form the basis for Plaintiffs' Bane Act claims, the Court refrains from deciding this issue at this time.[6]

## V.  **CONCLUSION**

Based on the foregoing, the following claims are **DISMISSED**:

1. Plaintiffs' first cause of action for deliberate indifference against McGarvey and Kakkar only.

2. Plaintiffs' second cause of action for deprivation of the right to familial association against McGarvey and Kakkar only.

3. Plaintiffs' third and fourth causes of action for supervisory liability against Westphal only.

4. Plaintiffs' state law claims against Westphal, McGarvey, and Kakkar only.

Because Plaintiffs have already had three opportunities to amend their claims and discovery has closed, the Court does not grant Plaintiffs leave to amend their TAC.[7]

//

//

---

[6] "The same state law immunity principles that apply to Plaintiff's negligence claims also apply to Plaintiff's Bane Act claim." *Bousman*, 2024 WL 1496220, at *11; *see also Barry v. Cnty. of Riverside*, No. EDCV 21-01770 JGB (KKx), 2022 WL 2063247, at *6 (C.D. Cal. May 11, 2022). However, because Defendants did not address state law immunity as applied to Plaintiffs' Bane Act claims, the Court will not address it here.

[7] In conjunction with their Motion to Dismiss, Defendants filed a Request for Judicial Notice in Support of Defendants' Motion to Dismiss Plaintiffs' TAC ("RFJN"). (Doc. 124-2.) In their RFJN, Defendants request that the Court take judicial notice of (1) Wilson's 911 call; (2) a portion of the footage from Anderson's body worn camera; (3) the version of 15 CA ADC § 1027.5 in effect on January 6, 2021; and (4) the Jail Policy and Procedure I.64, Safety Checks; and (5) Jail Policy and Procedure I.64, Inmate Counts. (*Id.* at 3.) Defendants use these exhibits to support the assertions that Wilson did not inform anyone that Arroyo was intoxicated until the officers arrived at her home, that the jail's safety check policy was more robust than the statutory requirement, and that "hard counts" are conducted twice day. (Doc. 124 at 7, 12.) While these assertions provide background information that is favorable to Defendants, they are not material to the Court's analysis above. Therefore, Defendants' RFJN is **DENIED** as moot.

1    **IT IS SO ORDERED.**

2    DATE:  November 4, 2024

3    _____

4    HON. RUTH BERMUDEZ MONTENEGRO

5    UNITED STATES DISTRICT JUDGE