EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
CHELSEA REHERMAN: SBN 343446
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA  92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF OMAR MORENO ARROYO by and through its successor-in-interest TAMMY WILSON; and TAMMY WILSON,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | CASE NO. 21-cv-1956-RBM-SBC<br><br>**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR DISCOVERY SANCTIONS** |

# I. INTRODUCTION

After destroying or recording over footage from cameras with a direct view into Omar's cell then withholding the use of force footage until Plaintiffs had already lost their claims against Kakkar, Defendant County lays the blame on Plaintiffs by alleging Plaintiffs are attempting to gain an unfair "tactical advantage" by waiting "to raise this issue until the eve of trial." In its opposition, the County provides no answer to this Court as to 1) what was contained in the litigation hold letter; 2) who was responsible for conducting the litigation hold from the Sheriff's Department and what steps they took; 3) why Homicide detectives would be responsible for litigation holds; 4) why no litigation hold letter was sent after Plaintiffs filed notices of claim; 5) why no one inquired or obtained the Kakkar footage despite counsel's knowledge of the use of force file for months; and 6) how and why Ms. Lanham's staff failed to produce evidence after they were told multiple times.

The only declarations lodged with this Court show that a claims representative, Ms. Garcia-Serrano, sent a litigation hold email to an unidentified recipient. But the County failed to lodge as an exhibit the actual document that shows what evidence was to be preserved. There is no declaration from a person who is responsible for the preservation with personal knowledge on how and why footage was lost or destroyed. Apparently no one sent a litigation hold letter after Plaintiffs filed a notice of claim on April 28, 2021 asserting that "jail authorities placed [Omar] in a holding cell with "insufficient monitoring of his condition" and that "when he was unable to breathe because a bolus in his throat caused obstruction, no jail personnel responded properly or timely." ECF 179-4, p. 6-7.

It does appear that litigation hold letters were sent on December 7, 2023, and April 3, 2024, but there is no explanation as to what materials they attempted to preserve three years after Omar died. This is at odds with the representation that the County's retention policy is 12 months. There is also no explanation as to why Mr. Lenert failed to request the Kakkar use of force video. It appears they were fully

aware of the existence of Kakkar's file and according to Ms. Lanham, she received the videos within hours of her inquiry.

The County suggests that it was the obligation of Homicide or DIS to preserve evidence in anticipation of civil litigation. Homicide investigation is for the purpose of determining if someone was responsible for the death of another. If indeed Homicide detectives function to defend the County in civil litigation, this would present a conflict of interest. DIS Sgt. Brayman makes no mention in her declaration that it was her job to preserve evidence in anticipation of civil litigation.

The County argues that they were under no obligation to preserve the hallway video because none of them showed Omar. On the contrary, there are multiple video cameras in the North/South hallway that look directly into Dress Out Cell number One. From the camera that is in the middle of the North/South hallway, Omar would have been seen inside the cell laying on his face by the door for hours. These cameras would have shown what the 12 deputies were doing as they walked past Cell Number 1. These cameras would have shown what deputy Wilt did and precisely how long he was at the door during the safety check.

The County argues Plaintiffs were not prejudiced by the failure to preserve critical evidence and asserts that any harm can be remedied by a second deposition of Geo Kakkar and by excluding the hallway videos. Unless this remedy brings Kakkar back into the case and provides Plaintiff with the missing footage that show the 12 deputies ignoring a dying man, they would serve no function.

## II. ARGUMENT

### A. Plaintiffs Provided Notice to Preserve the Hallway Video

Defendant argues that Plaintiffs did not provide "clear notice" to preserve the hallway video. ECF 227, p. 18. First, the County had an obligation to preserve documents if they were given "**some** notice that the documents were **potentially** relevant." *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (emphasis added). Once a party has such notice, the party engages in spoliation if it destroys or

fails to properly preserve the evidence in pending or future litigation. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015). Second, as of April 6, 2021, the Records Division, Sheriff Gore's attorney and the Acting County Counsel were put on clear notice that the County was required to preserve any video footage that depicted or showed Omar Moreno until his body was taken out of the Jail. ECF 179-3, p. 2. Apparently, this preservation letter was clear enough for the County to preserve all other footage of Omar's movements throughout the jail in other hallways. See Declaration of Julia Yoo, ¶ 4.

In fact, the County preserved a video of another cell door for approximately 1 hour and 45 minutes because Omar was placed in the cell, even though Omar is not even visible in the footage *Id.* at 5. Below is the footage from a hallway in the livescan corridor which was preserved and produced along with a multitude of other footage from other hallways.



(screenshot taken from video footage provided by the County, CSD 16).

The County preserved and produced hours of footage of Omar and yet selectively failed to preserve the footage from the camera outside Dressout cell one:



(CSD 167 – Plaintiffs now know that the camera outside of Dress Out Cell One is inside the silver object in the upper left top corner. From this camera, a portion of Omar's cell can be seen.)

It is inexplicable why the County would fail to preserve this particular footage and yet preserve other hallway footage from the livescan corridor. Most troubling is the failure to produce footage from cameras looking directly into Omar's cell as he was suffering a seizure and dying in front of the glass of the door. *Id.* at ¶ 4. Below are photos of the security cameras located in the North/South hallway. These were taken from Dress Out Cell 1.

CSD 286.



(A third camera appears to be at the South end of this hallway but it is not entirely clear. All cameras in this hallway have a view into Omar's cell.)

CSD 284.



(closeup of the silver camera located in the middle of the hallway)

After the County was placed on notice on April 30, 2021 through the tort claim forms that the litigation would involve the failure to monitor Omar or to timely respond to his medical emergency, no one from the County Counsel sent a litigation hold letter to anyone. The County argues that "under the circumstances and allegations at the inception of this dispute, there was no reason to preserve the Hallway Video." ECF No. 227, p. 18. Plaintiffs' complaint alleged, "Omar collapsed and began having seizure-like activity… Despite Omar's critical medical distress, no jail personnel responded properly or timely. Jail personnel did not commence life-saving measures until it was too late". ECF 1, p. 4. Plaintiffs alleged that DOES 6-20 included correctional staff, who were responsible for Omar Moreno's safety checks, and monitoring. *Id*. at p. 7. No case requires a litigant to use precise language such as "inadequate *Safety* Checks." Plaintiffs' tort claim triggered the County's duty to preserve *all* footage from the hallway showing Omar Moreno and all footage related to the way in which Omar was monitored in his cell.

**B. County Withheld Critical Kakkar Footage**

Defendant's argument that they did not violate Rule 26(f) because the Kakkar video was identified in reports written by experts in July 2024 is frivolous. Defendant suggests that because the Kakkar footage was provided to its own experts, it has somehow met its discovery obligation. To the County, if an expert makes a passing reference in their report to evidence which had been intentionally withheld from plaintiffs, this satisfies its requirement to supplement discovery responses.[1] The suggestion that retained experts, by listing "UOF" as a line item of things they reviewed, satisfied Rule 26 on behalf of County Counsel is itself a reflection of the

---

[1] Defense experts made no mention of Kakkar videos in the substance of their reports. *See* Declaration of Julia Yoo 13-14. Because Vrendenburgh only referenced a simulated safety check with a deputy and nothing related to watching or referencing a Kakkar video, Plaintiffs believed the two images reflected the simulated walk conducted by another deputy.

County's cavalier treatment of their ethical obligations and consistent with the pattern of gaslighting by this office.

Following Omar's death, Homicide interviewed Kakkar on January 20, 2021 where his use of force was specifically addressed. Exh. 1, Kakkar Report, CSD 425. Kakkar described to Homicide precisely what occurred with his use of force on another inmate and that as a result he was unable to conduct the safety check on Omar's cell. The County listed Kakkar as a witness and listed the entire homicide file in its initial disclosures. As of May 1, 2023, County Counsel were well aware of Kakkar's use of force file. Kakkar's statement to Homicide was produced to Plaintiffs on July 14, 2023. *Id.*; Exh. 2, Defendant Responses to Request for Production, Set One, p. 22.

Mr. Lenert alleges he did not learn until December 2023 that Kakkar was involved in a use of force incident that resulted in him failing to perform a Title 15 safety check on Omar's cell. ECF No. 227-1, Lenert Decl., ¶ 11. Mr. Lenert fails to explain how seven months earlier, the County was able to list Kakkar's statement in its initial disclosures. *See* ECF No. 69-5, Defendants' Initial Disclosures. Mr. Lenert fails to explain how he managed to produce Kakkar's statement to Plaintiffs five months before learning of it.

Also missing in anyone's declaration is why no one sought out the video until February 9, 2024, nearly one month after Kakkar's deposition and one business day before the discovery cutoff of February 12, 2024. *See* ECF 37. According to Ms. Lanham, she waited four weeks after Kakkar's deposition to inquire into the file then told her staff to wait until after the discovery cutoff to "deal with it." ECF No. 227-2, ¶ 4. There is no declaration from her staff on why they never produced the videos despite Ms. Lanham's requests. According to Ms. Lanham, Mr. Lenert was still lead counsel until February 2, 2024. Noticeably absent from Mr. Lenert's declaration is why he made no inquiry during the entire time he managed the case between May

of 2023 and February of 2024. By his own admission, Mr. Lenert knew of the file as of December 2023.

Defendants were not substantially justified in their failures. An inadequate search is not substantial justification. *See Patton v. First Light Prop. Mgmt., Inc.*, No. 14-CV-1489-AJB-WVG, 2016 WL 9503737, at *7 (S.D. Cal. Nov. 8, 2016).

### C. The Court Has Authority To Issue Sanctions

The Court can issue sanctions under Fed. R. Civ. P. 37(c) or use inherent authority to sanction the County for failing to supplement RFP responses in a timely manner. There is no sworn declaration that the failure to preserve evidence was an honest mistake. The County received multiple notices that it was required to preserve all footage showing Omar and showing the deputies' monitoring of Omar. No one from the County undertook to preserve the evidence.

As to the negative inference instructions, when the Court is considering sanctions under FRCP 37(c), "there is no requirement that a court find that the failure to disclose (or delay in disclosing) was willful or in bad faith." *Zest IP Holdings, LLC v. Implant Direct Mfg.*, No. CIV. 10-0541-GPC WVG, 2013 WL 6686809, at *3 (S.D. Cal. Dec. 18, 2013) citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). The County's failure to supplement the response to RFP 26, whether or not it was willful or in bad faith, was not substantially justified and was harmful to Plaintiffs. As such, the Court has a wide range of discretion in issuing sanctions.

### D. Intentionality Under *Gregory* Can Be Shown

Defendants had every reason to lie. They had every reason to withhold Kakkar's tapes so that the footage could not be used to rebut Kakkar's argument on the motion to dismiss. They had every reason to destroy evidence which would have conclusively proven that the deputies walked away from a man who was suffering a seizure and dying on the ground.

- 7 -                                                                  No. 21-cv-1954-RBM-SBC
PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR SANCTIONS

Courts have found that an examination of circumstantial evidence may be used to determine a party's intent. *See Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024) ("Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions."). Relevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation. *Id.*

The County selectively preserved the video from within Omar's cell and hours of footage of other hallway videos but made a decision to not preserve the hallway video that would have clearly shown the deputies who failed to monitor Omar. While preserving nearly two hours of hallway footage from earlier in the day looking into a cell in which Omar cannot be seen, the County inexplicably failed to preserve the hallway video looking into the cell where Omar died a few hours later. This type of selective preservation is precisely what the Court should consider when determining the County's intent to deprive Plaintiffs of highly relevant evidence.

### E. Plaintiffs Have Been Substantially Prejudiced

Defendants' withholding of evidence caused Plaintiffs the ultimate harm. Kakkar was dismissed from the case with prejudice. Plaintiffs are permanently denied an opportunity to show a jury the persistent pattern of deputies' failure in conducting cell checks. The hallway footage would have assisted Plaintiffs in two ways. One, Plaintiffs bear the burden to prove that the 12 defendants who walked past Dress Out #1 ignored Omar and his cellmates. Without the video footage from the North/South hallway, there is no direct evidence which a jury can see with their own eyes. Two, a *Monell* claim involves a pattern of conduct of County employees. The hallway footage would have enabled Plaintiffs to prove that all deputies during that shift were engaging in flybys or powerwalks.

The County asserts that because Plaintiffs have video footage from the vantage point of inside Omar's cell, Plaintiffs have not been prejudiced by the loss

of the video footage from outside Omar's cell. The camera inside Omar's cell is located on the very opposite side of the cell, away from the window and door. The deputies are not entirely visible during a cell check due to large sections of the concrete wall between the window and the door. The camera footage from inside Omar's cell is grainy, at best. From this vantage point, Plaintiffs lack the ability to clearly see the safety checks or determine precisely how long the officers look inside the cell. The hallway cameras are located on the wall directly above Omar's door and down the hallway with a clear view of the window and directly shows the deputies' actions during cell checks.

Moreover, the County provides no authority to support the assertion that preserving video evidence from one vantage point allows them to delete video evidence from different cameras. No Defendant is permitted to cherry pick which evidence is preserved because they deem one of many to be adequate. On the contrary, the *Jones* Court found that "production of some evidence does not excuse destruction of other relevant evidence." *Jones*, 95 F.4th at 736. There is no other remedy available to Plaintiffs beyond terminating sanctions.

### F. Prior Discovery Misconduct is Relevant

The County's discovery misconduct in prior cases, and this case, is relevant to show they cannot be trusted to engage in discovery in good faith. This was made even more evident in the County's opposition. There is a systemic failure to engage in ethical conduct. No system exists to ensure preservation and no one is accountable. The County's actions in this case, and others, show the breadth of issues plaguing the County when it comes to discovery violations.

### III. CONCLUSION

The County insists on two mutually exclusive things. One, it insists Plaintiffs gave insufficient notice without which they could not place a litigation hold. Two, there is no one who preserves evidence other than Homicide which had concluded its investigation within weeks of Omar's death. Even if the County counsel had sent

a litigation hold, there was no one whose job was to comply with it. The County Counsel's office only sends an email to an unnamed recipient for a hold but no one checks the footage and saves them other than what Homicide had decided to save and provided to DIS. After the County received Plaintiffs' notices of claims, no litigation hold was ever generated.

Within two weeks of Omar's death, the County was made aware through Kakkar's own statement to Homicide that he did not conduct the cell check based on a claim that he was disoriented from a use of force incident. County counsel now claims under oath that they found out about Kakkar's incident in December of 2023 despite listing Kakkar's statement in its initial disclosures seven months earlier.

As a result of the County's failures, Kakkar has been dismissed with prejudice and Plaintiffs have been denied direct video evidence which would have enabled them to prove a pattern of failed cell checks under *Monell*. Plaintiffs have been denied their strongest evidence in support of any punitive damages against individual defendants who left a man to die. Because the footage from inside the cell does not show the North/South hallway, this footage was the only way to show the conduct of these 12 deputies as Omar's cellmate remains standing for ten seconds in their direction. The denial of this evidence permits each of the deputies to lie as to their own conduct because Plaintiffs have no direct evidence to disprove them. Indeed, this is how Kakkar won. Under the circumstances, terminating sanctions are appropriate.

Respectfully submitted,

IREDALE & YOO, APC

Dated: January 24, 2025

*s/ Julia Yoo*
EUGENE IREDALE
JULIA YOO
CHELSEA REHERMAN
Attorneys for Plaintiffs