**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE ESTATE OF OMAR MORENO ARROYO, by and through its successor-in-interest Tammy Wilson, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No.: 3:21-cv-01956-RBM-SBC<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. 267]**<br><br>**(2) DENYING COUNTY'S MOTION FOR SUMMARY JUDGMENT [Doc. 266]**<br><br>**(3) DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 271]**<br><br>**(4) DENYING DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY [Docs. 262, 263, 264, 305]**<br><br>**(5) GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL [Docs. 269, 276, 285, 288]** |

Pending before the Court are the Parties' cross motions for summary judgment (Docs. 266, 267, 271), and the motions to exclude expert testimony (Docs. 262, 263, 264, 305) and motions to seal (Docs. 269, 276, 285, 288) related to those cross motions. The

1

Court finds the matters suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1). Having reviewed these motions and the briefs in opposition and reply, and for the reasons below, the Court rules as follows.

## I.     BACKGROUND[1]

This case concerns the in-custody death of 33-year-old Omar Moreno Arroyo ("Moreno"). (Doc. 303 [Third Amended Complaint ("TAC")], Introduction at 3–5.)[2] Tammy Wilson ("Wilson") was his wife and is his successor-in-interest. (*Id.*)

**A.     Defendants**

**1.     The Arresting and Transporting Officers**

Defendant Jared Anderson ("Anderson") was a deputy with the San Diego County Sheriff's Department ("SDCSD") who arrested Moreno. (*See* Doc. 313 [Joint Statement of Undisputed and Disputed Facts re: Motions for Summary Judgment ("JSF")] ¶¶ 41–42.)

Defendant Craig Rembold ("Rembold") was a deputy with the SDCSD who arrived after Moreno was in handcuffs on the porch and transported Moreno to the San Diego Central Jail. (*Id.* ¶¶ 45, 48.)

Defendant Robert Brunk ("Brunk") was a sergeant with the SDCSD who was the first to arrive on scene to speak to Wilson and Moreno (*id.* ¶ 18) and was responsible for supervising Anderson and Rembold. (TAC ¶ 13.)

**2.     The Jail Officers**

Defendant Edward Wilt ("Wilt") was a deputy with the SDSCD who conducted a safety check of Moreno's cell at 10:31 p.m., after Moreno collapsed onto the floor and "had seizure-like activity" around 9:42 p.m. (*Id.* ¶¶ 174, 177, 184–85, 193–94.)

---

[1] The Court sets forth these facts, where it can, based on the parties' Joint Statement of Undisputed and Disputed Facts re: Motions for Summary Judgment. (Doc. 313.) The Court cites to the undisputed facts in the JSF by paragraph number, and the disputed facts in the JSF by page number.

[2] The Court cites the paragraph numbers of the TAC and the CM/ECF electronic pagination for other filings unless otherwise noted.

3:21-cv-01956-RBM-SBC

Defendant Tanner Sherman ("Sherman") was a deputy with the SDCSD "stationed in the central command center ("CCC"), overseeing the overall facility and the movement of inmates and deputies." (*Id.* ¶ 195.)

Defendant Cesar Cardoza ("Cardoza") was a sergeant with the SDCSD responsible for staffing the shift with deputies on the day in question. (*Id.* ¶¶ 167, 197.)

Defendant Karl Kamoss ("Kamoss") was a lieutenant with the SDCSD who "was the watch commander on duty when this event occurred" (*id.* ¶ 169) and was responsible for supervising Wilt. (TAC ¶ 18.)

### 3. The County

Defendant County of San Diego ("the County") operates and manages the San Diego Central Jail and is "responsible for the actions and/or inactions and the policies, procedures, practices/customs of the Central Jail, and its respective employees, contractors and/or agents." (*Id.* ¶ 9.)

### 4. The Sheriff

Defendant William Gore ("Gore") was the Sheriff of the County of San Diego. (*Id.* ¶ 10.) Gore "was responsible for hiring, screening, training, retention, supervision, discipline, counseling, and control" of all SDCSD employees. (*Id.*)

## B. Factual Background

### 1. Wilson Calls 911

At 11:01 a.m. on January 6, 2021, Wilson called 911 because Moreno "was paranoid, saying that people were inside the house, not acting right and running around the house with a drill, [and] putting holes in the wall." (JSF ¶ 2.) Wilson told the Sheriff's dispatch that Moreno had no mental health diagnoses and that she believed Moreno may have been under the influence of drugs because of the way he was acting and because Moreno had behaved strangely that morning. (*Id.* ¶¶ 4–5.) About five and a half minutes into the call, Wilson hung up. (*Id.* ¶ 10.) Dispatch put out an alert for deputies to respond and communicated to the deputies that Moreno was acting paranoid. (*Id.* ¶ 13.) Dispatch categorized this call as "5150-PSYCH." (*Id.* ¶ 15.)

3:21-cv-01956-RBM-SBC

**2.     Moreno is Arrested, Transported to Jail, and Booked**

Brunk was the first to arrive on scene.  (*Id.* ¶ 18.)  He spoke to Wilson and Moreno, conducted a pat-down of Moreno, and escorted Moreno to the front porch.  (*Id.* ¶ 19.)  Brunk stated that Moreno could not answer what day or year it was, what medication he was on, or whether he had seen a doctor.  (*Id.* ¶¶ 20–21.)  Brunk wrote in his report that he "recognized Moreno's demeanor, mannerisms, and inability to respond to questions as signs of a person being under the influence of a controlled substance."  (*Id.* ¶ 22.)  Brunk then placed Moreno in handcuffs for everyone's safety.  (*Id.* ¶ 24.)

Anderson arrived after Brunk.  Anderson knew that dispatch had categorized the call as a "5150-PSYCH," and Wilson had informed him that Moreno was drilling holes in the wall.  (*Id.* ¶¶ 16, 40.)  When Anderson arrived, Wilson directed him to a dresser, where Anderson discovered a meth pipe with residue on it.  (*Id.* ¶ 25.)  Anderson administered field sobriety tests on Moreno, took his pulse, measured his pupils, and attempted to engage him in conversation.  (*Id.* ¶¶ 26–27.)  Anderson counted Moreno's resting pulse at 140 beats per minute, noting in his report that "[t]his is significantly above the normal range of 60 to 90" beats per minute.  (*Id.* ¶¶ 28–29.)  At 11:36 a.m., about half an hour after Wilson had initially called, Anderson "changed the event from 5150 to '11550 – Under the Influence of Drugs.'"  (*Id.* ¶ 41.)  Moreno was arrested and charged with "Possession of Controlled Substance Paraphernalia (Health and Safety Code ('HSC') § 11364) and Under the Influence of a Controlled Substance (HSC § 11550)."  (*Id.* ¶ 42.)  At the time, in an effort "to keep inmate population down due to the blooming COVID epidemic," the jail would not accept any arrestees booked on either of those charges without watch commander approval.  (*Id.* ¶¶ 43, 56–57.)

Rembold arrived after Moreno was already in handcuffs on the porch; he did not see, nor did the other deputies tell him, that Moreno had initially been contacted inside his home.  (*Id.* ¶¶ 45–46.)  Rembold transported Moreno to the San Diego Central Jail and arrived at 1:15 p.m.  (*Id.* ¶¶ 48–49.)  "During that hour-long transport, Rembold [did] not recall Moreno showing any signs to indicate he needed immediate medical care."  (*Id.*

¶ 50.)  Soon after arriving at the jail, Rembold was told by the pre-booking clerk that the jail would not accept Moreno for booking because of the COVID booking policies.  (*Id.* ¶ 56.)  Rembold attempted to call Anderson on his cell phone but did not have reception in the jail.  (*Id.* ¶ 66.)  Believing that Moreno had been contacted outside of his residence and that public intoxication was an equally appropriate charge, Rembold changed Moreno's charge to Penal Code § 647(f) so that the jail could book him.  (*Id.* ¶ 67.)

Moreno was then brought to the nurses' station for a medical screening by Nurse Emily Lymburn ("Lymburn") between 1:38 p.m. and 1:57 p.m.  (*Id.* ¶¶ 68–69.)  Lymburn spoke with Moreno for 10–15 minutes, observing him to be "well put together," speaking properly, slowly, and calmly, and showing no signs of being under the influence.  (*Id.* ¶¶ 73–82.)  Lymburn had no mental health concerns about Moreno, and measured his pulse at 97 beats per minute.  (*Id.* ¶¶ 85–87.)  In fact, despite Moreno's disclosure that he was a meth user, Lymburn remembered Moreno because "he was so normal."  (*Id.* ¶ 76.)

After he had cell reception again, Rembold spoke with Anderson, who told him that Moreno could not be booked for § 647(f) because Moreno had been arrested inside his own home.  (*Id.* ¶¶ 88–90.)  Rembold explained his error to the booking clerk, but was informed that the 8–12 hour booking process had to be completed once it begun.  (*Id.* ¶¶ 91–94, 104.)  Rembold contacted Anderson again and relayed that the booking staff suggested Anderson, as the arresting deputy, complete a form to drop or change the charge, which would allow them to release Moreno.  (*Id.* ¶ 99.)  Anderson arrived at the jail at 3:55 p.m. and signed the form to drop the § 647(f) charge at 4:30 p.m.  (*Id.* ¶ 101.)  Meanwhile, Moreno had gone through a body scan machine.  (*Id.* ¶ 102.)  The deputy who conducted Moreno's scan also did not observe Moreno to be under the influence.  (*Id.* ¶ 103.)  Moreno was placed under "book and release status" and placed in "dressout holding cell #1 on the second floor, referred to as the book and release tank."  (*Id.* ¶ 115.)

### 3.    Safety Checks

As defined by Title 15, a safety check is a "direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health

3:21-cv-01956-RBM-SBC

and welfare of inmates." (*Id.* ¶ 135.)  Deputies were trained to "look for signs of medical distress, trauma, or criminal activity" during safety checks.  (*Id.* ¶ 139.)  At the time of Moreno's arrest, Title 15 § 1027.5 mandated: "Safety checks shall be conducted at least hourly through direct visual observation of all inmates.  There shall be no more than a 60-minute lapse between safety checks.  There shall be a written plan that includes the documentation of routine safety checks." (*Id.* ¶ 121.)  The County's "Policy and Procedure I.64 on Safety Checks" required staff to conduct safety checks at least once within every hour, and to log the start time of a safety check, but not to log the time of the check of separate cells or each inmate. (*Id.* ¶¶ 120, 123.)  In the event a safety check could not be completed, staff were required to document an explanation and notify their supervisor. (*Id.* ¶ 132.)  Within each 12-hour shift, deputies performed two soft counts—counts of the number of inmates but not a comparison to confirm their identities—and one hard count—a comparison of each inmate to their identifying documents as well as a check for proof of life. (*Id.* ¶¶ 126–130.)  On the second floor, though, there is only one hard count per shift and no soft count. (*Id.* ¶ 128.)

### 4.  Moreno Dies in the Cell

No deputy performed a safety check on Moreno's cell between 8:48 p.m. and 10:34 p.m. (*Id.* ¶ 150.)  Deputy Geo Kakkar ("Kakkar")[3] began a safety check at 9:36 p.m. that was interrupted when he was involved in a use of force incident involving another inmate. (*Id.* ¶¶ 151–52.)  Just before he reached Moreno's cell, Kakkar stopped at a different cell, where inmates had alerted Kakkar that another inmate had been removing his sutures and was bleeding. (*Id.* ¶¶ 153–54.)  Kakkar opened the door to separate the inmates, and the bleeding inmate rushed past him and took a fighting stance. (*Id.* ¶ 155.)  Kakkar indicated over the radio that he needed assistance, as the inmate had used a flashlight to strike Kakkar several times in the head. (*Id.* ¶¶ 156–159.)  Kakkar testified that, due to his injuries, he

---

[3] Plaintiffs' claims against Kakkar were dismissed.  (*See* Doc. 139 at 40.)

did not think to contact his supervisor, Sergeant Cardoza, to discuss that his round of safety checks had been interrupted before completion. (*Id.* ¶ 163.) This was despite County policy and training stating that in the event of an emergency interfering with a safety check, the patrolling deputy is responsible for informing their supervisor. (*Id.* ¶¶ 161–62.)

Around the same time as this incident, at 9:37 p.m., Moreno removed his face mask and sat down on the bench in his cell. (*Id.* ¶ 165.) He then slouched down and appeared to put something in his mouth. (*Id.* ¶ 166.) At 9:41 p.m., Moreno collapsed forward off the bench, fell onto the floor, and "had seizure-like activity until approximately 9:42 p.m." (*Id.* ¶¶ 174–75.) At this time, "a dozen deputies [were] out in the hallway two to three doors down from Moreno's cell," responding to the use of force incident involving Kakkar and the bleeding inmate. (*Id.*) Moreno's body moves again at 9:44 p.m. (*Id.* ¶ 176.) At all times relevant to this factual summary, Sherman was stationed in the central command center, overseeing the facility and the movement of inmates and deputies. (*Id.* ¶ 195.) Sherman had "access to all the video in the facility," and could "see deputies performing safety checks." (*Id.*; Doc. 266-20 [Feb. 12, 2024 Dep. of Tanner Sherman] at 4:15–23, 12:10–20; Doc. 266-22 [Jan. 11, 2024 Dep. of Edward Wilt] at 10:3–10.) According to Cardoza, "it was Sherman's responsibility to notify the supervisors in the event a safety check was interrupted and unable to be completed." (JSF ¶ 200.) Kakkar did not tell Sherman that he did not finish his safety check.[4] (*Id.* at 47.)

Wilt logged the start of his round of safety checks at 10:31 p.m. (*Id.* ¶ 177.) He stopped and looked through the window into Moreno's cell; he saw Moreno "lying on the floor on his left side" but did not see Moreno moving or breathing. (*Id.* ¶¶ 184, 193–94.) Two other deputies conducted a hard count on Moreno's cell at 10:49 p.m. (*Id.* ¶ 202.) These deputies reported that Moreno's body was in an unnatural position blocking the cell door and that his tongue was swollen when they attempted to engage in life saving

---

[4] Defendants object to this fact as a "[r]epeated [f]act, incomplete." (JSF at 47.) But neither objection brings the fact itself into dispute.

measures and open his airway. (*Id.* ¶¶ 204–210.) Deputies began chest compressions and rescue breathing and applied an automated external defibrillator, and nurses administered doses of Naloxone. (*Id.* ¶¶ 211–12.) At about 11:23 p.m., Moreno was pronounced dead. (*Id.* ¶ 213.) His cause of death was "choking with a contributing factor of acute methamphetamine intoxication," and toxicological testing detected a positive result for methamphetamine at .35 mg/L in the peripheral blood. (*Id.* ¶¶ 214–15.) Wilt was never disciplined regarding proper cell checks, and his conduct was found to be in line with the policies and procedures of the SDCSD. (*Id.* ¶¶ 217–18.)

**5.   Causes of Action**

Plaintiffs bring the following causes of action:

1. Deliberate Indifference to Fourth and Fourteenth Amendment Rights to Medical Care under 42 U.S.C. § 1983 against Anderson, Rembold, Brunk, Sherman, Wilt, Cardoza, and Kamoss;

2. Deliberate Indifference to First Amendment Right to Association under 42 U.S.C. § 1983 against Anderson, Rembold, Brunk, Sherman, Wilt, Cardoza, and Kamoss;

3. Failure to Properly Train under 42 U.S.C. § 1983 against Gore, Brunk, Cardoza, and Kamoss;

4. Failure to Properly Supervise/Discipline under 42 U.S.C. § 1983 against Gore, Brunk, Cardoza, and Kamoss;

5. *Monell*[5] Municipal Liability under 42 U.S.C. § 1983 against the County;

6. Negligence against all Defendants;

7. Bane Act Violation against all Defendants; and

8. Wrongful Death against all Defendants.

TAC (¶¶ 303–464.)

---

[5] *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978).

3:21-cv-01956-RBM-SBC

## II.    MOTIONS TO NOT FILE UNDER SEAL

Plaintiffs have filed an Ex Parte Motion to Seal Portions of the Joint Statement of Disputed and Undisputed Facts. (Doc. 288.)  "After meeting and conferring . . ., the parties agreed to seal Disputed Facts Nos. 79–90.  These factual assertions are from the internal affairs investigation and the County has designated them as confidential under the protective order. . . .  The County does not oppose this motion." (*Id.* at 2.)  The Court finds that "compelling reasons" support the sealing of this portion of the document, as it concerns a non-public, internal employment investigation.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006); *Johnson v. San Benito Cnty.*, Case No.:12-CV-03691-LHK, 2013 WL 6248274, at *7 n.5 (N.D. Cal. Dec. 13, 2013).  The Court thus **GRANTS** Plaintiffs' Ex Parte Motion to Seal (Doc. 288).  The Clerk **SHALL FILE** Doc. 289 under seal.

Plaintiffs also have filed three Motions to *Not* File under Seal. (*See* Docs. 269, 276, 285.)  In each, Plaintiffs represent that they have lodged pleadings and exhibits under seal to comply with the Parties' Stipulated Protective Order (Doc. 28) and ensure Defendants suffer no prejudice from the disclosure of confidential materials. (*See generally* Docs. 269, 276, 285.)  Plaintiffs request an Order from the Court to *not* file many of these pleadings and exhibits under seal, as they are "unaware of any compelling reasons, supported by specific, articulable facts, that justify" them being filed under seal. (Doc. 269 at 3.)

Defendants argue that, in addition to substantive reasons to keep many of the pleadings and exhibits sealed, the Court should deny Plaintiffs' motions because Plaintiffs failed to meet and confer with Defendants before filing the three sealing motions. (Docs. 272, 281, 291; *see also* Doc. 281-1 at 2 [Decl. of Sarah H.] ¶ 2 ("Plaintiffs' counsel did not contact me and/or anyone in my Office to attempt to meet and confer about this current [sealing] motion."); The Hon. Ruth Bermudez Montenegro Civ. Chambers R. III.A and IV.B ("Any party contemplating the filing of any noticed motion before this Court must first contact opposing counsel to discuss thoroughly—preferably in person—the substance of the contemplated motion and any potential resolution.").)

3:21-cv-01956-RBM-SBC

Because Defendants attest that Plaintiffs did not comply with the undersigned's Chambers Rules, the Court **DENIES without prejudice** the motions to seal. To the extent the Parties seek further relief regarding sealing, they shall first meet and confer to determine whether resolution is possible through the filing of a joint motion. If the Parties are unable to resolve the issue through a joint motion, "counsel for the moving party must include in the notice of motion a statement to the following effect: 'This motion is made following the conference of counsel that took place on [date].'" The Hon. Ruth Bermudez Montenegro Civ. Chambers R. III.A.

### III.   MOTIONS TO EXCLUDE EXPERT TESTIMONY

As an initial matter, the Court finds that although Defendants' motions to exclude "present substantial issues, it is unnecessary to address [most] of them at this time" because "there are many genuine issues of material fact presented by the evidence to which no objections have been presented." *J.R. v. Oxnard Sch. Dist.*, Case No. LA CV17-04304 JAK (FFMx), 2023 WL 12179991, at *18 (C.D. Cal. May 1, 2023). The Court only addresses the objections to evidence relevant to resolution of the motions for summary judgment.[6]

**A.   Legal Standard**

"[E]xpert testimony is liberally admitted under the Federal Rules." *Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579, 588 (1993); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014) ("Challenges that go to the weight of the evidence are within the providence of a fact finder, not a trial court judge."). Still, the Court has a "basic gatekeeping obligation" to ensure that any testimony admitted from a qualified expert is "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 137 (1999) (citing *Daubert*, 509 U.S. at 589). A witness may testify as an expert if the Court is satisfied that "it is more likely than not" that:

---

[6]  Evidentiary objections related to evidence at trial may be raised through motions in limine as appropriate. *See J.R.*, 2023 WL 1217991, at *18.

10

3:21-cv-01956-RBM-SBC

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert* also set forth a non-exhaustive list of factors to guide the reliability inquiry; the Court asks whether the scientific theory or technique: (1) can, or has been, tested; (2) has been subjected to peer review and publication; (3) has a known or potential error rate; and (4) has gained general acceptance in the scientific community.  509 U.S. at 593–95.  The reliability inquiry is flexible, though, and the Court has "broad latitude" to decide not only whether to admit expert testimony, but also "*how* to determine [an expert's testimony's] reliability." *Kumho Tire*, 526 U.S. at 142 (emphasis in original).  Indeed, the Ninth Circuit has held that the listed *Daubert* factors are not applicable to non-scientific expert testimony, "whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citation omitted) (emphasis in original); *see also Kumho Tire*, 526 U.S. at 150 (noting that "the relevant reliability concerns may focus upon personal knowledge or experience").

**B.      Motion to Exclude Testimony by Plaintiffs' Expert Roger Clark (Doc. 262)**

Roger Clark ("Clark") is Plaintiffs' "police practices" expert.  (*See* Doc. 294 at 5.) Clark "is a twenty-seven-year veteran of the Los Angeles County Sheriff's Department" whose testimony "the Ninth Circuit has relied on . . . to establish the standard of conduct for law enforcement." (Doc. 294 at 5 (collecting cases).)

Relevant here, Defendants argue that Clark is not qualified to provide testimony (1) that Moreno was mentally ill or suffering a mental health crisis or (2) regarding contemporary law enforcement standards for responding to individuals in mental health crisis.  (Doc. 262-1 at 9–13.)  Plaintiffs argue that Clark is not testifying as to whether

Moreno had a mental illness, but as to "whether a suspect's demeanor or conduct would have led a reasonable officer to believe that the suspect was suffering from an emotional or mental crisis." (Doc. 294 at 16.) They also argue that Clark may testify as to contemporary police practices because of his lengthy experience in law enforcement and his opinions' reliance on current Peace Officer Standards and Training ("POST") and SDCSD policies. (Doc. 310 at 13–16.)

First, the Court agrees that Clark may not opine whether Moreno was mentally ill or suffering a mental health crisis, as he has insufficient medical experience or training. He may, however, "opine[ ] in terms of what properly trained officers know regarding" mental illness or crisis in arrestees. *A.B. v. Cnty. of San Diego*, Case No.: 18cv1541-MMA-LL, 2020 WL 4430971, at *3 (S.D. Cal. July 31, 2020). "As Plaintiffs point out, Clark is qualified to opine as such based on his 27 years of experience with the Los Angeles County Sheriff's Department, his California [POST] training, and other extensive experience in police training." *Id.*; *see also* Doc. 310 at 5–7, 12–15; *Garcia v. Cnty. of Riverside*, Case No.: CV 5:18-00839 SJO (ASx), 2019 WL 4282903, at *13 ("The Court [denies] Defendants' Motion in Limine #1 with respect to whether Mr. Clark can testify as to how officers ought to have responded to Decedent, given that there are facts in the record showing that Decedent suffered from mental and medical issues."). Second, the Court finds that Clark may testify as to contemporary police practices regarding responding to individuals in mental health crisis. *See Godinez v. Huerta*, Case No. 16-cv-0236-BAS-NLS, 2018 WL 2018048, at *3 (S.D. Cal. May 1, 2018) ("This experience has led other courts to find that Mr. Clark is qualified as an expert in police training standards and policies.") (collecting cases).

The Court thus **DENIES** Defendants' Motion to Exclude Testimony by Plaintiffs' Expert Roger Clark as to these forms of testimony. It **DENIES without prejudice** the motion as to all other forms of testimony to be proffered by Clark.

**C.      Motion to Exclude Testimony by Plaintiffs' Expert Dr. Shaun Carstairs (Doc. 263)**

"Dr. Shaun Carstairs is a board-certified Emergency Physician and Medical Toxicologist" with "a wealth of experience in providing emergency medical care in hospitals throughout San Diego." (Doc. 295 at 4; *see also* Doc. 295-2 at 10–25 [Dr. Carstairs' curriculum vitae].) Dr. Carstairs is Plaintiffs' causation expert. (Doc. 295 at 4.)

Relevant here, Defendants argue that Dr. Carstairs "is not qualified to give any opinions that Moreno suffered from mental illness" because he "has no psychiatric or psychological background or training that would allow him to make any such diagnosis." (Doc. 263-1 at 2, 5–7.) Plaintiffs argue that Dr. Carstairs may so opine because he "is an emergency room physician with extensive experience in treating patients suffering from mental illness in an acute setting and extensive experience with patients under the influence of drugs, including methamphetamine." (Doc. 295 at 9; *see also* Doc. 295-2 [Decl. of Dr. Shaun Carstairs] ¶¶ 10–12.)

The Court agrees with Plaintiffs that Dr. Carstairs may testify as to whether Moreno suffered from mental illness. *See Schroeder v. Cnty. of San Bernardino*, Case No. ED CV 18-427-DMG (JCx), 2019 WL 3037923, at *3 (C.D. Cal. May 7, 2019) ("it is well-settled that medical experts need not have a subspeciality in the particular field about which they testify") (citing *Doe v. Cutter Biological, Inc., a Div. of Miles Labs, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992) ("[C]ourts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.")). The weight to be given to his testimony is another matter, for the jury to determine. *See City of Pomona*, 750 F.3d at 1043–44. Therefore, the Court **DENIES** Defendants' Motion to Exclude Testimony by Plaintiffs' Expert Dr. Shaun Carstairs as to this form of testimony. It **DENIES without prejudice** the motion as to all other forms of testimony to be proffered by Dr. Carstairs.

**D.      Motion to Exclude Testimony by Plaintiffs' Expert Gary Raney (Doc. 305)**

Because the Court does not consider testimony by Plaintiffs' expert Gary Raney in

ruling on the motions for summary judgment, it **DENIES without prejudice** Defendants' Motion to Exclude Testimony by Plaintiffs' Expert Gary Raney.

### IV.   MOTIONS FOR SUMMARY JUDGMENT

**A.   Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material when, under the governing substantive law, it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted).

The initial burden of establishing the absence of any genuine issue of material fact falls on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can satisfy this burden by (1) presenting evidence that negates an essential element of the non-moving party's case or (2) demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id.* at 322–23.

Once the moving party has satisfied its initial burden, the non-moving party cannot rest on the mere allegations or denials of its pleading.  Rather, she must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks and citation omitted).  The non-moving party may meet this requirement by presenting evidence from which a reasonable jury could find in its favor, viewing the record as a whole, in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221–22 (9th Cir. 1995).  In determining whether there are any genuine issues of material fact, the Court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

3:21-cv-01956-RBM-SBC

**B.      Individual Defendants' Motion (Doc. 267)**

Each of Plaintiffs' federal claims is brought under 42 U.S.C. § 1983. "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (cleaned up). "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citation omitted).

### 1.      First Cause of Action - Deliberate Indifference to Serious Medical Need

Moreno's first cause of action alleges that: (1) Anderson, Rembold, and Brunk violated his Fourth Amendment right to post-arrest medical care by taking him to jail rather than to a hospital; (2) Rembold and Anderson violated his Fourth Amendment right to post-arrest medical care by failing to communicate vital information about his medical conditions to the jail nurse; and (3) Sherman, Wilt, Cardoza, and Kamoss violated his Fourteenth Amendment right to medical care during pretrial detention by failing to properly monitor him and failing to provide emergency medical care. (TAC ¶¶ 303–324.)

#### a.  Transport to Jail

The Fourth Amendment guarantees the right to objectively reasonable post-arrest medical care. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098–99 (9th Cir. 2006). This "means that police officers must 'seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.'" *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 769 (9th Cir. 2025) (quoting *Tatum*, 441 F.3d at 1099). "But this does not 'require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect.'" *Id.* (quoting *Tatum*, 441 F.3d at 1098). Rather, "the ultimate inquiry under the Fourth Amendment is whether the defendant's conduct was reasonable under the totality of the circumstances, viewed from

the perspective of a reasonable person on the scene[.]" *Henriquez v. City of Bell*, Case No. CV 14-1960GW(SSx), 2015 WL 13357606, at *6 (C.D. Cal. Apr. 16, 2015) (citing *Tatum*, 441 F.3d at 1098). And the reasonableness inquiry "is ordinarily a question of fact for the jury." *Id.* at *7 (collecting cases). "However, courts have also granted summary judgment to defendants . . . when the undisputed facts show that the defendants acted in an objectively reasonable manner. *Id.* (collecting cases).

A jury must decide whether Anderson, Rembold, and Brunk violated Moreno's Fourth Amendment right to post-arrest medical care; construing the facts in the light most favorable to Moreno, a reasonable jury could find that the officers' failure to summon prompt medical treatment for Moreno or take him to a hospital was objectively unreasonable. The Sheriff's dispatch relayed to these officers that Moreno was potentially under the influence of drugs, acting paranoid, saying that people were inside his house, and running around with a drill putting holes in the wall. (JSF ¶¶ 2, 4–5, 13.) The call was categorized as a "5150-PSYCH." (*Id.* ¶ 15.) When Brunk arrived on the scene, Moreno could not answer basic questions, and his demeanor and mannerisms suggested that he was under the influence of a controlled substance. (*Id.* ¶¶ 19–22.) When Anderson arrived, he found a meth pipe with residue on it. (*Id.* ¶ 25.) He also counted Moreno's resting pulse at 140 beats per minute, noting in his report that this was "significantly above the normal range of 60 to 90" beats per minute. (*Id.* ¶ 28.) "Considering all the facts at the scene, Anderson made a determination that [Moreno] was unable to care for himself." (*Id.* ¶ 38.) Under the totality of the circumstances, a jury could find that Moreno "presented with a substantial risk of serious harm and that [Anderson, Rembold, and Brunk] did not 'promptly summon [ ] the necessary medical help or . . . tak[e] the injured [Moreno] to a hospital' in an objectively reasonable manner." *D'Braunstein*, 131 F.4th at 770.

The facts here are distinguishable from the cases cited by Defendants. In *Neuroth v. Mendocino County*, for example, the plaintiff set forth insufficient evidence to "set him apart from the average suspected methamphetamine user that officers might encounter on the street." Case No. 15-cv-03226-RS, 2018 WL 4181957, at *7 (N.D. Cal. Aug. 31, 2018).

16

3:21-cv-01956-RBM-SBC

Officers encountered another such "average suspected methamphetamine user" in *Borges v. City of Eureka*, where the plaintiff was mumbling, sweating, and taking off his clothes on a public sidewalk. Case No. 15-cv-00846-YGR, 2017 WL 363212, at *2 (N.D. Cal. Jan. 25, 2017). The defendants prevailed at summary judgment in both of those cases because the mere fact that the plaintiff appeared to be under the influence of drugs when he was arrested did not create a genuine dispute as to whether the arresting deputies should have provided or summoned medical care rather than transport the plaintiff to jail. Considering the facts discussed above in this case, though, a reasonable jury could conclude that Moreno's "medical condition was so obviously emergent at the time he encountered the officers that taking him to the county jail constituted a failure to provide objectively reasonable post-arrest care." *Neuroth*, 2018 WL 4181957, at *7.

That "the deputies knew [Moreno] would be assessed by medical professionals at intake and would be referred for any necessary treatment either within the jail's medical unit . . . or at an emergency facility" does not compel a different conclusion. (Doc. 267-1 at 30 (citing Doc. 266-8 [Feb, 12, 2024 Dep. of Jared Anderson] at 4:21–5:3).) An officer who counts only on a medical screening provided hours after the arrest as part of the jail booking process cannot be said to be "either promptly summoning the necessary medical help or [ ] taking the injured detainee to a hospital." *Tatum*, 441 F.3d at 1099).

**Causation**. Defendants next challenge this claim on causation grounds. (Doc. 267-1 at 31–33; Doc. 283 at 27–29.) They argue that Moreno's sudden swallowing of his face mask constitutes an intervening cause that breaks the chain of proximate causation, and that the officers' decision not to take Moreno to a hospital could not have been the legal cause of his death because he did not die from any underlying medical event. (*Id.*)

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (citation omitted). "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Id.* "[A]lthough 'the question of proximate causation [in a § 1983 action] is sometimes for the court and

17

sometimes for the jury,' the court decides whether reasonable disagreement on the issue is tenable." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Springer v. Seaman*, 821 F.2d 871, 876–77 (1st Cir. 1987), *abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989) (alteration in *Van Ort*)); *see also Dold v. Snohomish Cnty.*, 649 F. Supp. 3d 1084, 1097 (W.D. Wash. 2022) ("Proximate cause is almost always a question of fact left for a jury.") (citing *Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 34 F.3d 753, 756 (9th Cir. 1994) and collecting cases); *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013) ("Causation is an intensely factual question that should typically be resolved by a jury."). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

The Court finds that causation must also be a jury question here. It is undisputed that Moreno's cause of death was "choking with a contributing factor of acute methamphetamine intoxication." (JSF ¶ 214.) Dr. Carstairs opined that Moreno's acute methamphetamine intoxication "resulted in bizarre and abnormal behavior including placing a cloth mask in his airway, which resulted in choking and was the proximal cause of his death." (Doc. 266-38 [Suppl. Report of Plaintiffs' Expert, Shaun Carstairs, M.D.] ¶ 3; *see also* Doc. 266-34 [Decl. of Dr. Binh Ly] ¶ 13 ("The seizure-like activity noted on video when [Moreno] collapsed in the holding cell . . . *may be consistent* with methamphetamine intoxication *but is more likely due to* hypoxia as a result of choking which is a more proximate cause of seizure-like activity and death.") (emphasis added).) On these facts, a reasonable jury could conclude that the deputies' actions were "a moving force behind a series of events that ultimately [led] to a foreseeable harm, even if other intervening causes contributed to the harm." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 667 (9th Cir. 2015); *see also Conn v. City of Reno*, 591 F.3d 1081, 1098–1101 (9th Cir. 2010) (leaving to a jury the question of whether a corrections officer's failure to respond to an inmate's attempt to choke herself and threats of suicide were a foreseeable cause of

the inmate's death by suicide two days later), *cert. granted, judgment vacated sub nom. City of Reno v. Conn*, 563 U.S. 915 (2011), *and opinion reinstated* 658 F.3d 897 (9th Cir. 2011).  Although "the inquiry into causation must be individualized," *Murphy*, 844 F.2d at 633, Anderson, Brunk, and Rembold each were aware of at least some of the circumstances surrounding Moreno's condition at the time of his arrest, and each chose not to summon medical care or transport him to a hospital.  Accordingly, the Court rejects Defendants' causation argument.

**Qualified Immunity**.  Finally, Defendants argue that each of the three officers is entitled to qualified immunity.  (Doc. 267-1 at 44–50.)  "The doctrine of qualified immunity shields government officials from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Castro*, 797 F.3d at 663 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether an officer is entitled to qualified immunity, the Court considers: (1) whether the officer's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the incident.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  A right is clearly established when it is "sufficiently clear that 'every reasonable official would have understood that what he is doing violates that right.'"  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Id.* (quoting *al-Kidd*, 563 U.S. at 741).  Although "clearly established law should not be defined at a high level of generality," *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019) (cleaned up), "officials can still be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" even if the specific action in question has not previously been held unlawful).  "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established."  *Shafer v. Cnty. of Santa*

*Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (cleaned up). "However, because resolving whether the asserted federal right was clearly established presents a pure question of law, [the Court] draw[s] on [its] full knowledge of relevant precedent rather than restricting [its] review to cases identified by the plaintiff." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) ("*Gordon II*") (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)).

As discussed above, a jury could reasonably find that the officers violated Moreno's constitutional right to post-arrest medical care. The Court thus turns to whether this right was clearly established at the time of the incident. As Moreno points out, the Court previously ruled that Brunk, Anderson, and Rembold were not entitled to qualified immunity on this issue. (Doc. 278 at 31 (citing *Est. of Arroyo v. Cnty. of San Diego*, Case No.: 3:21-cv-01956-RBM-SBC, 2024 WL 4668146, at *11–12 (S.D. Cal. Nov. 4, 2024).) The Court adopts its previous reasoning and arrives at the same conclusion: Moreno's right to objectively reasonable post-arrest care was clearly established at the time of the incident. *Accord D'Braunstein*, 131 F.4th at 771–774 (noting that the Ninth Circuit has "already treated this principle as clearly established" and collecting cases).

A reasonable jury could conclude that Anderson, Brunk, and Rembold failed to provide objectively reasonable post-arrest care and that this failure caused Moreno's constitutional injury. Furthermore, these officers are not entitled to qualified immunity. Therefore, the Court **DENIES** Defendants' motion for summary judgment on this claim.

### b. Communicating Medical Information at the Jail

Plaintiffs allege that Rembold and Anderson violated his Fourth or Fourteenth Amendment right to medical care by failing to communicate complete medical information to the booking staff and screening nurse at the jail. (TAC ¶¶ 304–314.) Assuming without deciding that there are genuine disputes of material fact as to this issue, the Court still finds that Plaintiffs' claim cannot proceed because Rembold and Anderson are entitled to qualified immunity.

The Court previously ruled that it would not, at the motion to dismiss stage, dismiss this claim on qualified immunity grounds. *See Est. of Arroyo*, 2024 WL 4668146, at *11–

3:21-cv-01956-RBM-SBC

12. "But our decision at the motion-to-dismiss stage sheds little light on whether the governmental actors might ultimately be entitled to qualified immunity 'were the case permitted to proceed, at least to the summary judgment stage' and the court is presented with facts providing context for the challenged actions." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (quoting *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004)). The Court thus considers Defendants' qualified immunity arguments now with the benefit of a developed factual record.

As noted above, Plaintiffs must show that the allegedly violated rights were clearly established. (*See supra* Section IV.B.1.a.) Plaintiffs argue that any reasonable officer would have known, because of *Conn v. City of Reno*, that he was violating the Constitution by failing to provide complete medical information to the booking staff and screening nurse. (Doc. 277 at 35–36 (citing 591 F.3d 1081).) But *Conn* held only that "[w]hen a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety." *Conn*, 572 F.3d at 1062. The Court's research has uncovered no controlling decision holding that an officer's failure to communicate to jail staff that an arrestee was under the influence and acting paranoid violates the arrestee's Fourth or Fourteenth Amendment rights. And the rule announced in *Conn* does not "apply with obvious clarity to the specific conduct in question" here. *Pelzer*, 536 U.S. at 741; *see also West v. City of Caldwell*, 931 F.3d 978, 984 (9th Cir. 2019) ("Prior precedent must articulate a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.") (citation and internal quotation marks omitted). Therefore, Rembold and Anderson are entitled to qualified immunity for failing to communicate medical information, and the Court **GRANTS** Defendants' motion for summary judgment on, this claim.

### c. Wilt's Safety Check

Plaintiffs allege that Wilt violated Moreno's Fourteenth Amendment right to medical care by conducting a deficient safety check. (TAC ¶¶ 316, 319–21.) It is undisputed that

Wilt logged the start of his safety check at 10:31 p.m. and saw Moreno "lying on the floor on his left side" but did not see Moreno move or breathe. (JSF ¶¶ 177, 184, 193–94.) Plaintiffs allege that Wilt "did nothing" and "alerted no one," and that it is up to the jury to determine whether Moreno "was still alive at this juncture." (TAC ¶ 320.) Assuming without deciding that there are genuine disputes of material fact as to this issue, the Court still finds that Plaintiffs' claim cannot proceed because Wilt is entitled to qualified immunity for his failure during the safety check to determine whether Moreno was in need of medical attention.

Defendants argue that at the time of Moreno's death, "'it was not clearly established [ ] that a detainee has a right to regular direct-view safety checks.'" (Doc. 267-1 at 51–52 (quoting *Hyde v. City of Wilcox*, 23 F.4th 863, 874 (9th Cir. 2022) (citing *Gordon II*, 6 F.4th at 972)).) In *Gordon II*, one of the deputies "conducted his safety check of [the decedent] from a corridor that was approximately six feet elevated from the tank floor and 12 to 15 feet away from the foot of [the decedent's] bunk." *Gordon II*, 6 F.4th at 967. The deputy admitted that "from his vantage point, he was unable to ascertain whether [the decedent] was breathing, alive, sweating profusely, drooling, or had any potential indicators of a physical problem." *Id.* About an hour after the deputy's last safety check, other deputies discovered the decedent in his cell; his "face was blue, he was unresponsive, and his skin was cold to the touch." *Id.* In finding that the deputy was entitled to qualified immunity, the Ninth Circuit noted that it was "not aware of any precedent expressly recognizing a detainee's right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Id.* at 972.

The thrust of Plaintiffs' claim is that Wilt should have determined whether Moreno was in need of medical attention, rather than trusting without verifying that Moreno was merely asleep. (*See* JSF ¶¶ 189–194; Doc. 277 at 41 ("Omar had been in the exact same position for over one hour. . . . Wilt watched him from the door [and did nothing].").) This brings it squarely within the scope of *Gordon II*. As one district court likewise concluded, a corrections officer who acted similarly to Wilt was entitled to qualified immunity:

> Plaintiffs argue that [the officer] was deliberately indifferent while performing the tier checks by failing to ensure [the decedent] was alive. . . . They note [the expert's] opinion that [the decedent] did not die shortly prior to being checked in his cell around 4:00 p.m. . . . , and they contend that [the decedent] was likely in the process of dying during one of the tier checks. . . . Plaintiffs argue that a reasonable juror could find that [the officer's] failure to check that [the decedent] was alive at all in the preceding three hours put him at an increased risk of substantial harm. . . .
>
> This claim thus exemplifies the arbitrary impact of qualified immunity jurisprudence on individual litigants. . . . Had [the decedent's] death occurred after *Gordon II*, the evidence Plaintiffs have presented would be sufficient for a jury to conclude . . . that [the officer's] tier checks were so cursory they demonstrated deliberate indifference to that right. But because [the decedent] died less than two years earlier, . . . qualified immunity takes that decision away from the jury, and the Section 1983 claims . . . must be dismissed.

*Christie v. Dep't of Corr.*, Case No. 3:22-cv-05692-TMC, 2024 WL 3939287, at *12 (W.D. Wash. Aug. 26, 2024) (cleaned up); *see also Nyarecha v. Cnty. of Los Angeles*, Case No. 2:20-cv-04474-WLH-MAA, 2023 WL 5505038, at *3 (C.D. Cal. July 18, 2023), *rev'd and remanded on other grounds by* 2024 WL 4511616 (9th Cir. 2024).

Despite *Gordon II*, Plaintiffs argue that the right was clearly established because the Ninth Circuit had held that a failure to conduct proper cell checks of an intoxicated detainee was a violation of the Fourteenth Amendment. (Doc. 277 at 39–40 (citing *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) ("the absence of frequent visual checks . . . clearly made the risk of serious harm to such prisoners substantial")).) This argument is unavailing. Although it mentioned "frequent visual checks" of cells, *Castro* was a failure to protect case. 833 F.3d at 1064; *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 668 (9th Cir. 2021) (explaining that *Castro* has been recognized for the proposition that a pretrial detainee has a clearly established right to be free from violence at the hands of other detainees); *Lucas v. Cnty. of San Diego*, Case No.: 20-CV-1735-CAB-JLB, 2021 WL 568787, at *7 (S.D. Cal. Feb. 16, 2021) (same). Because the rule announced in *Castro* does not "apply with obvious clarity to the specific conduct in question" here, *Pelzer*, 536 U.S. at 741, and because the Ninth Circuit has explicitly held that the right to direct-view

safety checks did not exist at the time of Moreno's death, Wilt is entitled to qualified immunity.  The Court **<u>GRANTS</u>** Defendants' motion for summary judgment on this claim.

### d. Sherman's View of Safety Checks from Central Command Center

Plaintiffs allege that Sherman violated Moreno's Fourteenth Amendment right to medical care by failing to adequately monitor Moreno from his position in the central command center and by failing to notify supervisors that the safety check Kakkar began at 9:36 p.m. was never completed.  (TAC ¶ 315; *see* JSF ¶¶ 199–201.)  Neither claim survives summary judgment.  First, for the same reasons discussed above regarding Wilt, Sherman is also entitled to qualified immunity on the claim that he failed to perform a direct-view safety check of Moreno to determine whether he needed medical attention.  (*See supra* Section IV.B.1.c.)  Second, the Court finds that Sherman was not deliberately indifferent when he failed to notify his supervisors of the incomplete safety check.

The Court analyzes Plaintiffs' Fourteenth Amendment medical care claim "under an objective deliberate indifference standard."  *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (*Gordon I*).  Plaintiffs must show that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'"  *Castro*, 833 F.3d at 1070 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  *Id.* at 1071

(citations and internal quotation marks omitted). Rather, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

Summary judgment is appropriate here because Plaintiffs cannot meet the third element of the deliberate indifference framework. By the time Moreno was medically screened by the nurse, "he didn't appear to be under the influence of anything." (Doc. 266-15 [Dep. of Nurse Emily Lymburn] at 17:21–21:24 (observing that Moreno "no longer had a pulse of 140, no longer was speaking rapidly, no longer had pupils reacting to light, and his muscle tone was not rigid").) And for the seven hours from when Moreno was taken to his cell to when he swallowed his face mask, he followed officers' instructions, sat inside the cell on a bench, and acted normally. (*See* JSF ¶ 117; Doc. 266-44, Exhibit NN [Video of Omar Moreno Arroyo in Custody] at 0:00:01–0:05:48; Doc. 266-26, Exhibit V [Video Clip] at 0:00:01–0:06:10.) There is thus no evidence that Sherman would have "appreciated the high degree of risk involved" in failing to report that a safety check was not completed. *Castro*, 833 F.3d at 1071; *see also Cavanaugh v. Cnty. of San Diego*, Case No.: 3:18-cv-02557-BEN-LL, 2020 WL 6703592, at *13 (S.D. Cal. Nov. 12, 2020) (finding that prison officials cannot be deliberately indifferent to a medical need that is hidden or unknown), *aff'd* 2021 WL 6103115 (9th Cir. Dec. 22, 2021); *Arceo v. City of Roseville*, No. 2:20-cv-02334-DAD-DB, 2024 WL 871463, at *7 (E.D. Cal. Feb. 28, 2024) (granting the prison officials' motion to dismiss because the plaintiff failed to allege that they "had the opportunity to observe plaintiff's allegedly obvious and serious need for medical treatment"). Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on this claim.

### e. Failure to Provide Emergency Medical Care

In addition to the direct-view safety check claims, Plaintiffs allege that Sherman, Wilt, Cardoza, and Kamoss also violated Moreno's Fourteenth Amendment right by failing to provide emergency medical care to Moreno after he collapsed. (Doc. 277 at 39–47.)

**Sherman**. As a deputy in the central command center, Sherman was charged with "overall command of the facility and movement of inmates and deputies," had "access to

all the video in the facility," and could "see deputies performing safety checks." (JSF ¶ 195; Doc. 266-20 [Feb. 12, 2024 Dep. of Tanner Sherman] at 4:15–23, 12:10–20; Doc. 266-22 [Jan. 11, 2024 Dep. of Edward Wilt] at 10:3–10.)

A reasonable jury could thus conclude that Sherman saw on the camera feed: Moreno fall off the bench in his cell, collapse onto the floor, have "seizure-like activity" until 9:42 p.m., and then remain motionless and sprawled out on the floor for over an hour until the two other deputies conducted their hard count at 10:49 p.m. (JSF ¶¶ 165–175, 202; Exhibit V [Video Clip] at 0:11:54–0:19:17.) Additionally, viewing the facts in the light most favorable to Plaintiffs, it would have been apparent to a prison officer that Moreno needed medical attention. As Plaintiffs note, the two other deputies understood "[w]ithin seconds" that Moreno needed immediate help. (*See* Doc. 277 at 41 (deputies observing that: Moreno "was facing down with his arms in an 'unnatural position;' his foot was "flush with the door in an abnormal and weird position;" "the positioning of [Moreno's] body did not look right;" and they "just saw a guy that . . . needed help") (citing JSF at 37–41).) "In other words, viewing the evidence in the light most favorable to [Plaintiffs], [Moreno] exhibited 'clearly observable and severe symptoms' that he was suffering from a medical emergency." *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1019 (C.D. Cal. Mar. 20, 2019) (quoting *Lopez v. Swaney*, 741 F. App'x 486, 487 (9th Cir. 2018)).

On this record, there is a question whether Sherman acted with deliberate indifference by not providing emergency medical care to Moreno. A reasonable jury could find that by failing to provide emergency medical care, Sherman made an intentional decision regarding the conditions of Moreno's confinement which put Moreno at a substantial risk of suffering serious harm, and the consequences of not providing emergency medical care under the circumstances were obvious. *Gordon I*, 888 F.3d at 1125. Additionally, for the same reasons discussed above (*see supra* Section IV.B.1.a), the question of causation—whether Sherman's intervention at some point after seeing Moreno's "seizure-like activity" may have prevented his death—must be one for the jury.

**Wilt.** During his round of safety checks beginning at 10:31 p.m., Wilt looked

26

3:21-cv-01956-RBM-SBC

through the window into Moreno's cell and saw Moreno "lying on the floor on his left side" but did not see Moreno moving or breathing. (JSF ¶¶ 177, 184, 193–94.) "It was very common for [him] to see individuals sleeping in unusual or even uncomfortable positions," and he "believed that Moreno was sleeping." (Doc. 266-31 [Decl. of Edward Wilt] ¶¶ 4, 7.) Unlike Sherman, Wilt would not have seen Moreno collapse onto the floor or have "seizure-like activity." But as discussed above, viewing the facts in the light most favorable to Plaintiffs, a reasonable official in Wilt's position may have been able to tell that Moreno needed medical attention.

Defendants also argue that "even if Deputy Wilt had observed signs of medical distress (which he did not) and summoned medical care, those actions would and could not have saved Moreno," meaning that the claim against Wilt "fails on causation." (Doc. 267-1 at 39.) They assert that Wilt saw Moreno "approximately 53 minutes after Moreno exhibited signs of medical distress and ceased moving," well beyond the time that Moreno would have died from choking. (*Id.* at 38.) Plaintiffs argue that there are genuine disputes as to when Moreno actually died and when, during the hour that Moreno was sprawled on the cell floor, would have been too late for emergency medical care to have saved him. (Doc. 277 at 79–82 ("Wilt's cell check occurred 53 minutes after [Moreno] ceased moving," which is "not the same as conducting the cell check 53 minutes after [Moreno] ceased ***breathing***" and "when paramedics and additional personnel arrived, CPR was unsuccessful and they could not get a return of spontaneous circulation although they ***did temporarily have a rhythm***.") (bolding and italics in original).

As expected, the Parties' experts disagree on whether Moreno could have been saved at the time Wilt performed his safety check. (*Compare* Doc. 266-30 [Decl. of Michael Vredenburgh] at 13 ("Moreover, CPR in the typical circumstances (when throat blockage can be cleared), needs to begin before 4 minutes of the heart stopping, with death occurring at 4–6 minutes.") *with* Doc. 266-38 [Suppl. Report of Plaintiffs' Expert, Shaun Carstairs, M.D.] ¶ 6 ("This is no way implies that *all* patients will experience permanent and irreversible brain damage if they do not receive CPR within 4 minutes, and neurologic

27

recovery is certainly still possible in some patients even if more than 4 minutes have elapsed between onset of cardiac arrest and initiation of CPR.").)

"Causation is an intensely factual question that should typically be resolved by a jury." *Pac. Shores Props., LLC*, 730 F.3d at 1168; *see also City of Pomona*, 750 F.3d at 1043–44 ("Challenges that go to the weight of the evidence are within the providence of a fact finder, not a trial court judge."); *Dold*, 649 F. Supp. 3d at 1097 ("Proximate cause is almost always a question of fact left for a jury."). Whether Wilt's intervention—which, at the earliest, would have been over 50 minutes after Moreno's "seizure-like activity"—may have prevented his death must also be determined by the jury.

**Cardoza and Kamoss**. Plaintiffs allege that Cardoza and Kamoss walked past Moreno's cell when they responded to the use of force incident involving Kakkar and another inmate, saw Moreno in need of medical attention, and did not provide emergency care. (Doc. 277 at 44–47.) As an initial matter, Defendants argue that "there is no evidence that Lt. Kamoss was in that hallway or otherwise responded to the use of force incident." (Doc. 283 at 27.) But Kamoss "saw Kakkar after the attack" (Doc. 266-41 [Decl. of Karl Kamoss] ¶ 6), and it is undisputed that "Cardoza and Lt. Kamoss arrived at the scene immediately after the use of force." (JSF ¶ 170.)

Plaintiffs argue that the video of the incident gives rise to the reasonable inference that two of the detainees in Moreno's cell tried to get the attention of prison officers in the hallway after Moreno swallowed his mask, and that "Cardoza and Kamoss were made aware of [Moreno's] condition and ignored it." (Doc. 277 at 46 (citing Exhibit V [Video Clip]).) Defendants argue that "the assumption that Cardoza and/or Kamoss (or any other deputy could have heard or did hear something at the window, especially in the midst of handling an emergency several yards away, amounts to nothing more [than] unsupported conjecture." (Doc. 283 at 26–27.)

"To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys. Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (affirming grant of

summary judgment because the evidence "establishe[d] only that this set of events could conceivably have occurred; it [did] not give rise to a reasonable inference that it did in fact occur"). Additionally, when events are captured on video, "the Court need not view the facts in the light most favorable to the nonmoving party; it 'should [ ] view[ ] the facts in the light depicted by the videotape.'" *Rodriguez v. City of Bakersfield*, No. 1:23-cv-01286-KES-CDB, 2025 WL 1433817, at *6 (E.D. Cal. May 19, 2025) (quoting *Scott*, 550 U.S. at 381) (alterations in *Rodriguez*). But "[t]he mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott*, 550 U.S. at 380).

On a motion for summary judgment, the Court's function "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249). The question, therefore, is whether a reasonable jury could draw the inference that Cardoza and Kamoss were aware that Moreno was in need of medical attention. The Court finds that a reasonable jury could.

At 9:41:29, Moreno suddenly slouches over on the bench. (Exhibit V [Video Clip] at 0:11:43.) One of the detainees in Moreno's cell quickly gets off the bench on which they were sitting, walks over to the door, and appears to bang his hand on the window or door and attempt to open the cell door. (*Id.* at 0:11:43–0:11:52.) This detainee then goes back to where he was sitting. (*Id.* at 0:11:55.) About two minutes later, the deputies who were responding to the use of force incident walk down the hallway past Moreno's cell. (*Id.* at 0:13:42–0:13:54.) During the time the deputies walk past the cell, another detainee quickly stands up from his bench and walks toward the door, where he remains standing and facing the door until the deputies pass. (*Id.* at 0:13:42–0:14:16.) According to Defendants' own expert, "[o]ne deputy appears to have looked into a window of the holding cell," although this "did not give him a view of [Moreno's] sprawled out body." (Doc. 266-30 [Decl. of Michael Vredenburgh] at 6.) A reasonable inference could be

drawn that, like the unidentified deputy who looked in, Cardoza and Kamoss also could have looked in the holding cell, where they could have seen Moreno's body. Plaintiffs likely will face significant challenges convincing a jury of this theory. But viewing the facts in the light most favorable to Plaintiffs, it is a theory that survives summary judgment.

**Qualified immunity**. Although the qualified immunity analysis should be particularized, the law was clearly established such that Sherman, Wilt, Cardoza, and Kamoss each would have known that they were violating Moreno's constitutional rights. "[P]rison officials violate the Constitution when they 'deny, delay or intentionally interfere' with needed medical treatment.'" *Sandoval*, 985 F.3d at 679 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "The rule . . . is clear: a prison official who is aware than in inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Id.* at 680. Because a reasonable jury could find that Sherman, Wilt, Cardoza, and Kamoss were each aware that Moreno was suffering from a serious medical condition and chose not to provide emergency medical care, none of them are entitled to qualified immunity on this claim.

### 2.    Second Cause of Action – First Amendment Familial Association

"The First Amendment [ ] protects 'family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Keates*, 883 F.3d at 1236 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 695 (9th Cir. 2001)); *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987) ("The intimate relationships to which we have accorded constitutional protection include marriage . . . ."); *Mann v. City of Sacramento*, 748 F. App'x 112, 114–15 (9th Cir. 2018) ("In other words, relationships involving marriage, child-rearing, or cohabitation are protected by the First Amendment."). Wilson was Moreno's wife and the two shared a home. (TAC ¶¶ 4, 32.) Their relationship was thus protected by the First Amendment.

The Court notes that "there appears to be 'no Ninth Circuit case setting out specifically the conduct or elements that constitute violation of familial association under the First Amendment.'" *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 973 (E.D. Cal. 2017) (quoting *Schwartz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, No. 2:10-CV-03048-MCE-CMK, 2013 WL 5375588, at *10 (E.D. Cal. Sept. 24, 2013)). Courts typically analyze a plaintiff's First Amendment rights to familial association "by the same standard as Fourteenth Amendment rights to familial association based on the Ninth Circuit's analysis in *Lee*." *Id.* at 973. A loss of association claim under the Fourteenth Amendment is cognizable when the official's conduct "shocks the conscience." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citations omitted). "A prison official's deliberately indifferent conduct will generally 'shock the conscience' so long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Id.*

As analyzed above, a reasonable jury could find that each of the individual Defendants was deliberately indifferent under the Fourth or Fourteenth Amendment. Additionally, viewing the facts in the light most favorable to Plaintiffs, each of the individual Defendants "had time to deliberate" before their actions or inaction: Rembold, Anderson, and Brunk had time to consider whether to transport Moreno to jail; Sherman had time as he monitored the video feed; Wilt had time as he conducted his safety check; and Kamoss and Cardoza had time as they walked past Moreno's cell. *See Lee*, 250 F.3d at 684 (noting "where officers have ample time to correct their obviously mistaken detention of the wrong individual, but nonetheless fail to do so, the suspect's family members need only plead deliberate indifference to state a claim under the due process right to familial association").

Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment on the First Amendment claim as to: Rembold, Anderson, and Brunk for transporting Moreno to jail; and Sherman, Wilt, Cardoza, and Kamoss for failing to provide emergency medical care. The Court **GRANTS** Defendants' Motion for Summary Judgment on the First

Amendment claim as to: Rembold and Anderson for failing to communicate medical information at the jail; and Wilt and Sherman for failing to perform adequate safety checks.[7]

### 3. Third and Fourth Causes of Action – Failure to Properly Train, Supervise, and Discipline

Plaintiffs allege that Gore, Brunk, Kamoss, and Cardoza are liable as supervisors for their failures to train, supervise, and discipline their subordinates. (TAC ¶¶ 332–378.) Defendants argue that: (1) Brunk, Cardoza, and Kamoss are not liable because Plaintiffs did not produce evidence that they were responsible for providing formal training to their subordinates, and none of the supervisors are liable because (2) there is no causal link between their conduct and the claimed constitutional violations; (3) there is no evidence that they were aware of any prior incidents of misconduct committed by their subordinates; and (4) they are entitled to qualified immunity. (Doc. 267-1 at 41–44, 52–53.)

As a preliminary matter, a supervisor cannot "be held liable under § 1983 where no injury or constitutional violation has occurred." *Jackson v. City of Bremerton*, 268 F.3d 646, 653–54 (9th Cir. 2001) (citation omitted); *see also Mitchell v. City of Pittsburg*, No. C 09-00794 SI, 2011 WL 249458, at *13 (N.D. Cal. Jan. 26, 2011) ("The Court has found that the officers are entitled to summary judgment on the Fourth and Fourteenth Amendment constitutional claims. By extension, [the supervisor defendant] is entitled to summary judgment on the failure to train and failure to supervise claims.").

As discussed above, the potential constitutional violations here arise from

---

[7] Defendants argue that they are entitled to qualified immunity "on all federal § 1983 claims." (Doc. 267-1 at 44.) They do not specifically argue this point as to the First Amendment claim, though. (*See id.* at 44–53.) Still, the Court finds that the individual Defendants are not entitled to qualified immunity on this claim; as noted above, it had been clearly established that loss of familial association caused by a prison official's deliberate indifference was cognizable. *See Kaur*, 263 F. Supp. 3d at 974 (denying qualified immunity on First Amendment claim and collecting cases).

(1) Anderson and Rembold transporting Moreno to jail rather than a hospital and (2) Sherman, Wilt, Cardoza, and Kamoss failing to provide emergency medical care as Moreno lay dying. But Plaintiffs do not argue that Brunk, Cardoza, or Kamoss failed to train or supervise their subordinates regarding either of these actions or omissions. They argue instead that Kamoss failed to train the booking deputies to release people who should not have been detained, and that both Kamoss and Cardoza failed to train the jail deputies to conduct adequate safety checks. (Doc. 277 at 52–55.) Because the Court already found that the individual officers are entitled to qualified immunity as to the failure to conduct direct view safety checks and the failure to communicate medical information to the jail booking staff, these actions cannot form the basis of supervisor liability. *See Mitchell*, 2011 WL 249458, at *13. The Court finds similarly as to the failure to release Moreno after realizing that he had not violated Penal Code § 647(f); although it may form a basis for Plaintiffs' state law claims (*see infra* Section IV.4, 6), it does not violate a constitutional right and cannot form the basis of supervisor liability.[8] Therefore, the Court **<u>GRANTS</u>** the

---

[8] "Section 1983 limits a federal court's analysis to the deprivation of rights secured by the federal 'Constitution and laws.'" *Lovell by and through Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 370 (9th Cir. 1996) (quoting 42 U.S.C. § 1983). A violation of state law can be actionable under § 1983 only when the "violation of [that] state law causes the deprivation of a right protected by the United States Constitution." *Id.* Plaintiffs argue only that Anderson and Rembold violated Moreno's rights under the California Constitution and California law (*see* Doc. 277 at 48 & n.21).

And even if the Court construed Plaintiffs to be bringing a § 1983 claim on a Fourth Amendment unlawful arrest theory, Defendants are correct that such a claim would fail "because it is undisputed that the arresting deputies had probable cause to arrest Moreno for being under the influence and for possessing drug paraphernalia." (Doc. 267-1 at 59 (citing *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) ("probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense").) Plaintiffs argue that Anderson and Rembold violated a host of California laws in failing to release Moreno. (*See* Doc. 277 at 49–52.) But these arguments are foreclosed by binding precedent. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("state restrictions [on arrest] do not alter the Fourth Amendment's protections"); *Edgerly*, 599 F.3d at 956 ("We therefore hold that [the plaintiff's] arrest was

3:21-cv-01956-RBM-SBC

Motion for Summary Judgment as to supervisory liability for Brunk, Cardoza, and Kamoss.

The Court turns next to Plaintiffs' argument that supervisor liability should attach to Gore because he was aware "that the County maintained a grossly deficient training on arresting deputies dealing with mentally unstable people," and "did nothing to ensure that his deputies would have a basic understanding on how to deal with suspects they come into contact with who are exhibiting symptoms of mental illness." (Doc. 277 at 55–58.)

"Under Section 1983, supervisors cannot be held liable for the acts of their reports under a respondeat superior theory." *Hyde*, 23 F.4th at 874. They "can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Id.* (citation and internal quotation marks omitted). The plaintiff must show that the official was deliberately indifferent to the need to train or supervise subordinates and the lack of training or supervision "actually caused the constitutional harm." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citation omitted).

Here, Plaintiffs have raised a triable issue as to Gore's "own culpable action or inaction" in the training of deputies to transport arrestees like Moreno to the hospital instead of jail. As another court in this District noted, "Gore was in charge of the hiring, training, supervision, discipline, and control of all" SDCSD employees and "had authority over the County's policies and their implementation." *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1080–81 (S.D. Cal. 2023). Viewing the facts in the light most favorable to Plaintiffs, Anderson, Brunk, and Rembold could have seen that Moreno was under the influence of drugs, in the throes of a mental health crisis, or both. (*See* Doc. 277 at 12–14 (citing Doc. 266-8 [Dep. of Jared Anderson] at 6:1–9:3, 15:7–16:24, 23:11–26:2); *supra* Section III (relevant expert testimony of Dr. Carstairs and Roger Clark).) The Court

_____

constitutional, even though it was impermissible under state law").

already found that there is at least a jury question as to whether it was objectively unreasonable under the circumstances for the officers to transport Moreno to jail rather than a hospital.  And Anderson stated in his deposition that he could not recall if he was given any training that addressed when an arrestee in medical distress should be taken to a hospital rather than to jail.  (Doc. 266-8 [Dep. of Jared Anderson] at 6:1–23.)  Therefore, a reasonable jury could also find that Gore failed to implement training to ensure arrestees were given objectively reasonable post-arrest medical care as required by the Fourth Amendment.

Plaintiffs have also raised a triable issue as to whether Gore's failures to implement training policies "actually caused" Moreno's injury.  "Drawing inferences in favor of Plaintiff, the Court finds that a reasonable jury could find Sheriff Gore's failure to" implement these policies "was a moving force behind Plaintiff's injury—that a better trained staff would have" ensured compliance with the Fourth Amendment.  *Greer*, 726 F. Supp. 3d at 1081.

Nor is Gore entitled to qualified immunity on this claim.  At the time of Moreno's death, it was "clearly established that supervisory prison officials [could] not turn a blind eye or acquiesce in their subordinates' constitutional violations."  *Greer*, 726 F. Supp. 3d at 1082 (citing *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2001)).  "Thus, if a supervisory prison official knows that his subordinates are violating clearly established rights, his failure to take action to stop such conduct also violates constitutional rights."  *Id.* Defendants correctly note that the Court may still resolve qualified immunity questions where facts are disputed.  (*See* Doc. 267-1 at 45–46 (citing *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) ("Where disputed facts exist . . . we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct.").)

Here, that version is: "During Anderson's field training in around 2014, the practice was to take [an arrestee in medical distress] first to an LPS facility for treatment and then subsequently to book them into custody. . . .  This procedure later changed approximately

3-4 years into his law enforcement career. . . . The current procedure is that 'we would book them straight into custody.'" (Doc. 277 at 14 (citing Decl. of Jared Anderson).) Viewing these facts in the light most favorable to Plaintiffs, the SDCSD, at the time led by Gore, implemented a policy that would have put all supervisory officials on notice that their deputies may have been violating arrestees' Fourth Amendment rights. Therefore, the Court **DENIES** the Motion for Summary Judgment as to supervisor liability for Gore.

### 4.    State Law Immunities

Defendants argue that some of them are immune from liability for the state law claims alleged in the Sixth through Eighth Causes of Action. Specifically: (1) Anderson, Rembold, and Brunk are immunized by California Government Code section 820.2 for their discretionary acts during Moreno's arrest; (2) those three deputies are also immunized by California Government Code section 855.6 for their health assessment of Moreno and determination that he did not need to be transported to a hospital; (3) and Wilt, Sherman, Cardoza, and Kamoss are immunized by California Government Code section 845.6 for their failures to obtain medical care for Moreno in the jail. (Doc. 267-1 at 53–55.)

### a.  Section 820.2 Immunity

Under California Government Code § 820.2, a "public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." "A discretionary act requires a conscious balancing of risks and advantages when making basic policy decisions; . . . it does not protect operational or ministerial decisions that implement policies." *Trujillo v. Cnty. of Ontario*, 428 F. Supp. 2d 1094, 1123 (C.D. Cal. 2006) (citing *Bell v. California*, 63 Cal. App. 4th 919, 929 (1998)); *see also M.D. v. Cnty. of San Bernardino*, Case No. 5:22-cv-1357-SP, 2023 WL 8895699, at *8 (C.D. Cal. Nov. 15, 2023) ("[i]mmunity is reserved for those *basic policy decisions* which have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be unseemly") (emphasis in original) (cleaned up). "An operational act is one in which the person who made the decision, implemented the decision." *Trujillo*, 428 F.

36

3:21-cv-01956-RBM-SBC

Supp. 2d at 1123 (citation omitted).

Defendants have not explained how transporting Moreno to jail rather than a hospital was a discretionary decision akin to a basic policy decision. They only state summarily that § 820.2 "provides immunity to peace officers for their discretionary acts in arrest situations" and cite to two cases where the courts *denied* officers' summary judgment motions on § 820.2 grounds. (*See* Doc. 267-1 at 53–54.) The Court finds that the deputies' decisions to transport Moreno to jail were the type of operational ones that are not entitled to § 820.2 immunity.

Furthermore, § 820.2 immunity does not apply to "claims of false imprisonment or false arrest predicated on an officer's detaining a suspect without reasonable suspicion or probable cause." *Liberal v. Estrada*, 632 F.3d 1064, 1085 (9th Cir. 2011), *abrogated on other grounds by Hampton v. California*, 83 F.4th 745 (9th Cir. 2023). Therefore, the deputies are not immunized by § 820.2 against claims that they were negligent in arresting Moreno without probable cause.

### b.  Section 855.6 Immunity

California Government Code § 855.6 provides that "[e]xcept for an examination or diagnosis for the purpose of treatment," public entities and public employees acting within the scope of their duties are not liable for failing to perform an adequate examination to determine whether an individual has a "physical or mental condition that would constitute a hazard to the health or safety of himself or others." "But on its face, section 855.6 does not apply to Plaintiffs' claims arising out of the failure to summon medical care." *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1098 (N.D. Cal. 2014); *see also Lum v. Cnty. of San Joaquin*, 756 F. Supp. 2d 1243, 1257 (E.D. Cal. 2010) ("While the immunity granted under [§ 855.6] is broad, it has been held that it does not extend to a situation where the defendant fails to provide medical care for a prisoner in obvious need of such care.") (citing *Lucas v. City of Long Beach*, 60 Cal. App. 3d 341, 349 (1976)). Because the Court found that the obviousness of Moreno's need for medical care is a triable issue, Defendants are not entitled to § 855.6 immunity.

3:21-cv-01956-RBM-SBC

### c.  Section 845.6 Immunity

California Government Code § 845.6 immunizes public entities and public employees from liability for injuries "proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody," unless "the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  Because the Court found that a jury could reasonably conclude that Wilt, Sherman, Kamoss, and Cardoza knew Moreno was in need of immediate medical care, Defendants are not entitled to § 845.6 immunity.

### 5.    Sixth and Eighth Causes of Action – Negligence and Wrongful Death

### a.  Clarification Regarding Court's Previous Order (Doc. 300)

The Court previously ruled that it would not strike allegedly "new" allegations that Plaintiffs added after being given an opportunity to refile the TAC in light of Judge Chu's ruling on privileged material in the County Incident Review Board reports.  (Doc. 300 at 6–12.)  Relevant to the Sixth (negligence), Seventh (Bane Act), and Eighth (wrongful death) Causes of Action, these allegations are:

> Anderson and Rembold were negligent in causing [Moreno] to be imprisoned for the violation of being drunk in public when they knew that [Moreno] was not in public.  They were negligent in failing to contact a watch commander who could have immediately released [Moreno].

(TAC ¶ 419.)

> [Moreno's] death and suffering were the proximate result of the intentional and reckless decision of Anderson and Rembold to continue booking [Moreno] for a crime they knew he did not commit.  This conduct was inherently coercive.

(TAC ¶ 440.)

As discussed in its previous Order (*see* Doc. 300 at 9–10), the Court considers these allegations in the context of Plaintiffs' negligence, Bane Act, and *Monell* claims because Defendants fairly could have been said to have been on notice of these theories.  The Court does not, however, view these allegations as creating a new and separate cause of action for false imprisonment; Plaintiffs' previous Complaints never purported to raise a separate

38

3:21-cv-01956-RBM-SBC

false imprisonment claim. *See Terpin v. AT & T Mobility LLC*, 118 F.4th 1102, 1113 (9th Cir. 2024) ("the district court did not err by declining to consider this new theory [the plaintiff] raised for the first time in response to a motion for summary judgment").

### b. Merits

"Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions[.]" *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 628–29 (2013) (citing Cal. Gov't Code § 820). To establish negligence, "a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Id.* at 629 (cleaned up) (alteration in original).

Plaintiffs claim that Defendants were negligent in a litany of ways. (*See* TAC ¶¶ 415–35.) Defendants argue that they are not liable for negligence because of various state law immunities and because all of Plaintiffs' negligence theories fail on causation. (Doc. 267-1 at 53–55.) As discussed above, none of the state law immunities shield Defendants from liability (*see supra* Section IV.4), and the question of causation must be decided by a jury (*see supra* Section IV.B.1.a). Therefore, the Court **DENIES** the Motion for Summary Judgment as to the Sixth Cause of Action. *See Est. of Nunis by & through Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867, 887–88 (S.D. Cal. 2023) (denying summary judgment motion on negligence claims where the court had already denied summary judgment on § 1983 claims because "state negligence law [is] broader than Fourth Amendment law") (citing *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013)).

Defendants also argue that the wrongful death claim "'is derivative of [a] negligence claim, and cannot succeed if [said] negligence claim is dismissed.'" (Doc. 267-1 at 57 (quoting *Oh v. Teachers Ins. & Annuity Ass'n of Am.*, 53 Cal. App. 5th 71, 82 (2020) (alterations in Defendants' brief).) Because Defendants argue that the wrongful death claim fails for the same reasons as the negligence claim, and because the Court already rejected Defendants' negligence arguments, it also rejects Defendants' wrongful death arguments. *See Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal.

2017) ("Both § 1983 and §845.6 can form the basis of a claim for wrongful death.") (citation omitted). The Court **DENIES** the Motion for Summary Judgment as to the Eighth Cause of Action.

### 6.     Seventh Cause of Action – Bane Act

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation or coercion." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation and internal quotation marks omitted). "The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (quoting *Reese*, 888 F.3d at 1043). "[A] reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *Reese*, 888 F.3d at 1045 (citation omitted).

Defendants argue that Plaintiffs cannot bring a Bane Act claim because they have failed to show any underlying federal or state constitutional violation. (Doc. 267-1 at 55–57.) As the Court has already found that there is a triable question of whether Defendants violated Moreno's Fourth and Fourteenth Amendment rights, however, it also finds a triable question with respect to Plaintiffs' Bane Act claims arising from the same facts. *See Perez v. City of Fontana*, Case No. CV 19-1623-DMG (KKx), 2023 WL 4826232, at *14 (C.D. Cal. June 15, 2023). The Court **DENIES** the Motion for Summary Judgment as to the Seventh Cause of Action.

### C.    Plaintiffs' Motion for Partial Summary Judgment (Doc. 271)

#### 1.    *Monell* Liability

A municipality may not be held vicariously liable under § 1983 based only on the allegedly unconstitutional acts of its employees. *Jackson v. Barnes*, 749 F.3d 755, 762 (9th Cir. 2014); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, a plaintiff may recover under *Monell* under any of three theories. *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). First, when a local government acts "pursuant to an expressly

3:21-cv-01956-RBM-SBC

adopted official policy." *Id.* Second, when a local government acts pursuant to a "longstanding practice or custom." *Id.* Third, when "the individual who committed the constitutional tort was an official with final policy-making authority," or such official "ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (cleaned up).

To succeed on any of these theories, a plaintiff must show that: (1) he suffered a constitutional injury; (2) the injury was committed pursuant to the municipality's policy, omission, or policymaker ratification; (3) the policy amounted "to deliberate indifference to the plaintiff's constitutional right;" and (4) the policy was the "moving force" behind the constitutional injury. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). The questions of whether a policy or custom exists, and whether that policy or custom evidences a deliberate indifference to constitutional rights, are normally for the jury. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996); *Oviatt by & through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992).

### 2.    Merits

Plaintiffs argue that they "are entitled to partial summary judgment as to liability on the *Monell* claim" under the official policy, longstanding practice or custom, and ratification theories. (Doc. 271 at 2; Doc. 271 at 39.) Defendants argue that summary judgment for Plaintiffs is not appropriate because no policy-making official ratified a subordinate's unconstitutional decision, the County's policies and customs complied with the Constitution, and even if they did not, they were not the moving force behind Moreno's constitutional injury. (Doc. 273 at 23–34.)

The Court addresses two preliminary matters that limit the scope of its analysis. First, the Court rejects Defendants' argument that Plaintiffs cannot show a constitutional injury sufficient for *Monell* liability to attach because "there was no constitutional right to direct view safety checks at the time of Moreno's death." (Doc. 273 at 6.) The "qualified immunity analysis is irrelevant to the issue of *Monell* liability." *Lowry v. City of San Diego*, 818 F.3d 840, 855 (9th Cir. 2016) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)) ("[A]

41

3:21-cv-01956-RBM-SBC

municipality is not entitled to the shield of qualified immunity from liability under § 1983."); *see also Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983.") (emphasis in original); *Maya v. Cnty. of San Bernardino*, Case No. EDCV 19-1871 JGB (KKx), 2023 WL 4383344, at *51 (C.D. Cal. June 1, 2023) ("There is obviously no qualified immunity issue on the *Monell* claim, for municipalities cannot escape liability for constitutional violations by arguing that the law was not clearly established at the time of the violations."). Second, the Court does not address Defendants' causation arguments here because Plaintiffs do not dispute that causation is a jury question. (Doc. 286 at 12 ("Plaintiffs' motion requests a finding as a matter of law that the County's policies and practices on monitoring were unconstitutional. Plaintiffs did not request a judicial finding as a matter of law that the Jail's practices were the moving force . . . .").) The Court now turns to the Parties' other arguments.

### a. Official Policy

Plaintiffs argue that the County is liable under *Monell* for a number of official policies. (*See* Doc. 271 at 44–45 (identifying eight County policies).) Viewing the facts in the light most favorable to Defendants, the Court cannot say as a matter of law that the County's policies were deliberately indifferent in violation of Moreno's Fourteenth Amendment rights.

As discussed above, pretrial detainees "have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon II*, 6 F.4th at 973. Plaintiffs argue that the County's policies amounted to deliberate indifference to this right. (Doc. 271 at 47–53.) Defendants argue that they did not. (Doc. 273 at 23–25.) In support of their arguments, the Parties set forth dizzying amounts of evidence, and fight over both the reasonable inferences to be drawn and the applicability of relevant case law to these inferences. (*See generally* Docs. 271, 273, 286.) "[I]t is clear to the Court that the parties are merely arguing over competing evidence related to this claim, not demonstrating the absence of evidence supporting the claim. This

is not the stuff of summary judgment." *Medina v. Cnty. of Los Angeles*, Case No. CV 19-3808-GW-Ex, 2020 WL 3964793, at *20 (C.D. Cal. Mar. 9, 2020). The issue of whether the County's policies evinced deliberate indifference is typically a jury question, *Pearce*, 954 F.2d at 1478, and the Court sees no principled reason to deviate from that approach here. *Accord Est. of Solis v. Cnty. of Riverside*, Case No. 5:23-cv-00989-HDV-(SPx), 2025 WL 2632392, at *12 (C.D. Cal. June 23, 2025) (denying the plaintiff's motion for summary judgment because "the jury would still need to determine whether safety checks . . . are so inconsistent with constitutional rights as to amount to deliberate indifference.") (internal quotation marks omitted). Therefore, the Court **<u>DENIES</u>** Plaintiff's Motion for Partial Summary Judgment as to their official policy theory.

### b. Longstanding Practice or Custom

Plaintiffs also argue that the County is liable under *Monell* because "there was a persistent *de facto* policy of permitting deputies to conduct 'fly-bys' where they glance into the cell for a few seconds and tak[e] no action after cell checks were abandoned or failed to be completed." (Doc. 271 at 45.) Defendants argue that Plaintiffs really identify "isolated errors" insufficient to show a well-settled custom. (Doc. 273 at 29–33.)

To succeed under this theory, Plaintiffs must show "a longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Gillette*, 979 F.2d at 1346–47. Liability "must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918 (collecting cases). The Parties disagree whether the record shows that such a practice or custom exists,[9] as well as whether that practice or custom constitutes deliberate indifference. (*Compare* Doc. 271 at 16–39, 49–

---

[9] Plaintiffs argue that the County conceded that it had a widespread practice. (Doc. 286 at 10–11.) The County has not. (Doc. 273 at 29–33 ("There was no widespread custom of constitutional violations. . . . In this context, the safety checks that were missed or not conducted fall[ ] far short of what would be needed to establish a persistent or widespread practice."); Doc. 266-1 at 18–20.)

3:21-cv-01956-RBM-SBC

51 *with* Doc. 273 at 10–12, 29–33.)  For the reasons already discussed above, both these questions must be resolved by a jury.  The Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment as to their longstanding custom or practice theory.

### c. Ratification

Finally, Plaintiffs argue that the County is liable under *Monell* because the current Sheriff of San Diego County, Kelly Martinez, ratified the deputies' unconstitutional conduct.  (Doc. 271 at 39–42.)  They represent that Martinez met with Wilson to discuss Moreno's death and told Wilson that "her deputies had done nothing wrong."  (*Id.* at 39 (citing Doc. 271-4 [Decl. of Tammy Wilson] ¶¶ 2–6).)  Furthermore, Martinez "never retrained or disciplined" Wilt, Kakkar, or their supervisors because "[t]heir conduct was found to be in line with the policies and procedures" of the SDCSD.  (*Id.* at 39–42.)

Even "[i]solated constitutional violations may give rise to municipal liability where an agent of the municipal corporation possesses final policymaking authority and 'ratifies' a subordinate's actions."  *Est. of Villarreal ex rel. Villarreal v. Cooper*, 929 F. Supp. 2d 1063, 1077 (E.D. Wash. 2013).  Some courts "have stopped short of holding that a plaintiff can prove *Monell* liability simply on the basis of a defendant department's post-incident ratification through failure to discipline," *Mueller v. Cruz*, Case No.: SA CV 13-01274-CJC (JCGx), 2015 WL 9455565, at *3 (C.D. Cal. Dec. 23, 2015), but the Ninth Circuit has acknowledged that the behavior of the policymaker after the constitutional violation is relevant to *Monell* liability.  *See Larez v. City of Los Angeles*, 946 F.2d 620, 647 (9th Cir. 1991); *Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1196 (C.D. Cal. 2022) (denying defendants' motion for summary judgment as to ratification because the sheriff had, among other things, "permitted the officers to continue patrolling after the incident" and "continue accruing overtime and participating in field assignments even after [he] transferred them to desk duty"); *Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 979 (N.D. Cal. 2017) (denying motion to dismiss where the plaintiff alleged that the police chief "made statements . . . tending to show that he endorsed or approved the unconstitutional conduct of individual officers[,]" which evinces ratification).

3:21-cv-01956-RBM-SBC

"Ratification is generally a fact question for the jury[.]" *Mueller*, 2015 WL 9455565, at \*3. Especially here, where the question of whether deputies violated Moreno's constitutional rights must be answered by a jury, the Court finds that determining *Monell* liability on a ratification theory is inappropriate at summary judgment. *Accord Est. of Villarreal*, 929 F. Supp. 2d at 1077 ("If a jury were to find that [the officer's] actions violated [the plaintiff's] Fourth Amendment rights, that jury could conceivably accept [the police chief's] statements as ratification," meaning that "issues of material fact remain and summary judgment must be denied on this issue."). The Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment as to their ratification theory.

**D.     The County's Motion for Summary Judgment (Doc. 266)**

The County moves for summary judgment on all four causes of action alleged against it: *Monell* liability; negligence; Bane Act liability; and wrongful death. (Doc. 266-1 at 8.)[10]

**1.     Fifth Cause of Action – *Monell* Liability**

Defendants argue that Plaintiffs' *Monell* claim fails on several elements. First, Defendants assert Plaintiffs "cannot meet the threshold requirement of proving that any Defendant violated either Wilson's or Moreno's constitutional rights." (Doc. 266-1 at 10.) The Court has already found that this presents a triable issue. (*Supra* Section IV.B.1–2.) Second, Defendants assert Plaintiffs "cannot prove the existence of a widespread,

---

[10] In their opposition to Defendants' motions for summary judgment, Plaintiffs also argue that punitive damages are available under *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014), because "Defendants are liable not just for the conduct that killed [Moreno], but for conduct that caused him pain and suffering. (Doc. 278 at 78–79.) Defendants argue that Plaintiffs misread *Chaudhry*. (Doc. 283 at 28.) These arguments do not appear in either Party's motion for summary judgment, and the Court declines to resolve a legal question raised solely in the response and reply. *See Villalpando v. Exel Direct Inc.*, Consolidated Cases Case Nos. 12-cv-04137-JCS, 13-3091-JCS, 2016 WL 1598663, at \*19 (N.D. Cal. Apr. 21, 2016).

3:21-cv-01956-RBM-SBC

longstanding custom or practice that caused Moreno's death." (Doc. 266-1 at 18–20.)  The Court has already found that this presents a triable issue.  (*Supra* Section IV.C.2.b.)  Third, Defendants assert Plaintiffs cannot prove that a final policymaker ratified "'a subordinate's [unlawful] decision *and the basis for it*.'"  (Doc. 266-1 at 24–25 (quoting *Gillette*, 979 F.2d at 1348 (emphasis in Doc. 266-1)).)  The Court has already found that this presents a triable issue.  (*Supra* Section IV.C.2.c.)  Fourth, Defendants assert "Plaintiffs cannot prove that the County's policies or customs were the 'moving force' behind Moreno's death" because his death "would likely have occurred regardless of what these policies and customs did or did not mandate."  (Doc. 266-1 at 11–14.)  For the same reasons that it has already found that proximate causation for the individual Defendants' actions presents a triable issue (*see supra* Section IV.B.1.a), the Court finds that proximate causation for the County's policies or customs presents a triable issue.

And fifth, Defendants argue "Plaintiffs cannot establish that the County acted with 'deliberate indifference' by failing to enact or modify certain policies, or by ignoring training deficiencies."  (Doc. 266-1 at 20–22.)  Defendants argue that, because of the lack of sufficiently similar incidents in the past, the County was not "on actual or constructive notice that its omission would likely result in a constitutional violation."  (Doc. 266-1 at 20–21 (quoting *Gibson v. City of Washoe, Nev.*, 290 F. 3d 1175, 1186 (9th Cir. 2002).)

Plaintiffs may prove the County was on notice by showing: (1) "the policy [was] so facially deficient that any reasonable policymaker would recognize the need to take action" to prevent the likely violation of a constitutional right, or (2) "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141–42 (9th Cir. 2020) (citations omitted).

The Court finds that summary judgment is inappropriate because, viewing the facts in the light most favorable to them, Plaintiffs have presented sufficient evidence to show that the County was on notice.  A non-Defendant supervisory officer wrote an email to a captain in the SDCSD about how he had taken "a group consisting of [his] two sergeants

46

3:21-cv-01956-RBM-SBC

and several deputies" on several safety checks. (Doc. 271 at 50.)  In that email, he indicates that he had to remind the officers that "it was a safety check and not a power walk or ded [sic] walk as some called it before," and that because of the focus on conducting adequate checks, the officers were able to prevent "several medical emergencies" by confiscating a detainee's hidden medications.[11]  (*Id.*)  The California State Auditor reviewed 30 in-custody deaths in San Diego County and, among other things, "found instances in which deputies performed these [safety] checks inadequately," observing "multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked through the housing module."[12]  (*Id.* at 35–37 (citing Doc. 278-32 [California State Auditor Report on San Diego County Sheriff's Department].)  Further, in the year before Moreno's death, deputies at the jail self-reported "over 300 separate instances in which . . . they violated California state law by not starting their cell check rounds of the floor on time" and about 30 instances in which they "performed no check of any cell on the floor at all during the required hour."  (*Id.* at 39

---

[11]    Defendants object to this piece of evidence as irrelevant.  (Doc. 273-1 at 4–6.) "[O]bjections for relevance are generally unnecessary on summary judgment because they are 'duplicative of the summary judgment standard itself.'"  *Sandoval*, 985 F.3d at 666 (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)). Although this email post-dates Moreno's death, it may still help create a triable issue as to whether the County was on notice.

[12]    Defendants raise hearsay and authentication objections to this piece of evidence.  (Doc. 273-1 at 2–4.)  The Court does not consider this evidence to be hearsay because it is being considered not for the truth of the matter asserted, but for its effect (potentially providing notice) on the listener.  Additionally, courts "have routinely overruled authentication and hearsay challenges at the summary [judgment] stage where the evidence could be presented in an admissible form at trial."  *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1232 (N.D. Cal. 2018).  Thus, the Court can properly consider the California State Auditor's Report because Plaintiffs could authenticate it at trial.  *See, e.g.*, *Eubanks v. Okanogan Cnty.*, NO. CV-03-0074-EFS, 2005 WL 8158680, at *4 (E.D. Wash. Feb. 2, 2005) ("The 1999 Audit Summary and Overview of Okanogan County by the Washington State Auditor . . . is a public record under Rule 901 and is self-authenticating as a domestic record of regularly conducted activity in the County under Rule 902(11).").

3:21-cv-01956-RBM-SBC

(citing Docs. 271-21–23 [SDCSD's Daily Area Activity Log Review Report].)  Although Moreno did not die as a result of smuggling in medications, and although not every instance of a failed safety check resulted in a detainee's death, this evidence creates at least a triable issue that the County was on notice that its officers were not conducting adequate safety checks, and that such failures had resulted in constitutional injuries.

Accordingly, the Court **DENIES** the County's Motion for Summary Judgment as to the Fifth Cause of Action.

### 2.  Sixth through Eighth Causes of Action – State Law Claims

Plaintiffs bring the same state law causes of action against the County as they do against the individual Defendants.  (*See supra* Section IV.B.4–6.)  Defendants argue first that the County is immune from direct liability because of California Government Code section 844.6.  (Doc. 266-1 at 25–26.)  However, § 844.6's immunity applies "except as provided in this section and in Section [ ] 845.6."  Cal. Gov't Code § 844.6(a).  And as discussed above, under § 845.6, "the public entity where the employee is acting within the scope of his employment, is liable if [1] the employee knows or has reason to know that the prisoner is in need of immediate care and [2] he fails to take reasonable action to summon such medical care."  Because the Court found that a jury could reasonably conclude that Wilt, Sherman, Kamoss, and Cardoza knew Moreno was in need of immediate medical care, Defendants are not entitled to § 844.6 immunity.  Defendants argue second that the County cannot be vicariously liable for conduct that does not violate state law or that is immunized under state law. (Doc. 266-1 at 26–28.)  As discussed above, the state law immunities asserted by Defendants do not apply.  (*See supra* Section IV.4.)  And as discussed above, there is a triable issue as to whether Defendants' conduct violated the Bane Act or the duties of care for negligence and wrongful death claims.  (*See supra* Section IV.5–6.)  Therefore, the Court **DENIES** the County's Motion for Summary Judgment as to the Sixth through Eighth Causes of Action.

### V.  CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

3:21-cv-01956-RBM-SBC

1. The Individual Defendants' Motion for Summary Judgment (Doc. 267) is **GRANTED IN PART** and **DENIED IN PART**.

    a. As to Plaintiffs' First Cause of Action, the Court **GRANTS** the Motion for Summary Judgment based on qualified immunity as to: Rembold and Anderson for failing to communicate medical information at the jail; and Wilt and Sherman for failing to perform adequate safety checks.

    b. As to Plaintiffs' First Cause of Action, the Court **DENIES** the Motion for Summary Judgment as to: Rembold, Anderson, and Brunk for transporting Moreno to jail; and Sherman, Wilt, Cardoza, and Kamoss for failing to provide emergency medical care.

    c. As to Plaintiffs' Second Cause of Action, the Court **GRANTS** the Motion for Summary Judgment as to: Rembold and Anderson for failing to communicate medical information at the jail; and Wilt and Sherman for failing to perform adequate safety checks.

    d. As to Plaintiffs' Second Cause of Action, the Court **DENIES** the Motion for Summary Judgment as to: Rembold, Anderson, and Brunk for transporting Moreno to jail; and Sherman, Wilt, Cardoza, and Kamoss for failing to provide emergency medical care.

    e. As to Plaintiffs' Third and Fourth Causes of Action, the Court **GRANTS** the Motion for Summary Judgment as to Brunk, Cardoza, and Kamoss and **DENIES** the Motion for Summary Judgment as to Gore.

    f. As to Plaintiffs' Sixth through Eighth Causes of Action, the Court **DENIES** the Motion for Summary Judgment as to all individual Defendants.

2. Plaintiffs' Motion for Partial Summary Judgment (Doc. 271) is **DENIED**.

3. The County Defendant's Motion for Summary Judgment (Doc. 266) is **DENIED**.

4. Defendants' Motion to Exclude Opinion Testimony by Plaintiffs' Expert Roger Clark is **DENIED in part**, consistent with the Court's Order above. (*See supra* Section III.B.) In all other respects, the motion is **DENIED without prejudice**.

3:21-cv-01956-RBM-SBC

5. Defendants' Motion to Exclude Opinion Testimony by Plaintiffs' Expert Dr. Shaun Carstairs (Doc. 263) is **DENIED in part**, consistent with the Court's Order above. (*See supra* Section III.C.)  In all other respects, the motion is **DENIED without prejudice**.

6. Defendants' Motion to Exclude Opinion Testimony by Plaintiffs' Expert Gary Raney (Doc. 305) is **DENIED without prejudice**.

7. Plaintiffs' Ex Parte Motion to File Portions of the Joint Statement of Disputed and Undisputed Facts (Doc. 288) is **GRANTED**.  The Clerk of Court **SHALL FILE** Doc. 289 under seal.

8. Plaintiffs' Motions for Leave to Not File Under Seal (Docs. 269, 276, 285) are **DENIED without prejudice** consistent with the Court's Order above.  (*See supra* Section II.)

The Court previously indicated that it would reschedule the pretrial conference upon resolution of the Parties' motions for summary judgment.  (Doc. 198.)  The Court now **RESETS** the Final Pretrial Conference and related deadlines as follows:

| Event | Date/Deadline |
| --- | --- |
| File Memoranda of Contentions of Fact and Law Pursuant to Local Rule 16.1(f)(2) | June 11, 2026 |
| Pretrial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(3) | June 18, 2026 |
| Meet and Confer Pursuant to Local Rule 16.1(f)(4) | June 25, 2026 |
| Plaintiffs' Counsel Provides Opposing Counsel with Proposed Pretrial Order | July 2, 2026 |
| Parties Lodge Proposed Final Pretrial Conference Order Pursuant to Local Rule 16.1(f)(6) | July 9, 2026 |

3:21-cv-01956-RBM-SBC

| Final Pretrial Conference | July 16, 2026 at 1:30 p.m. |
| --- | --- |
| | |

Additionally, the Parties **SHALL CONTACT** the Chambers of Magistrate Judge Chu on or before **April 3, 2026** to schedule a further Settlement Conference.  The Settlement Conference **SHALL** take place on or before **June 4, 2026**.

**IT IS SO ORDERED.**

Dated:  March 24, 2026

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

51

3:21-cv-01956-RBM-SBC